515 A.2d 1331

**WESTERN PENNSYLVANIA SOCIALIST WORKERS 1982 CAMPAIGN, Francis Farley, Mark Zola and Linda Nordquist, Appellants,**

**v.**

**CONNECTICUT GENERAL LIFE INSURANCE COMPANY, Appellee.**

Supreme Court of Pennsylvania.

Argued March 3, 1986.

Decided Oct. 6, 1986.

24

Jon Pushinsky, Pittsburgh, for appellants.

Eric A. Schaffer, Kenneth C. Kettering, Douglas Y. Christian, Reed, Smith, Shaw & McClay, Pittsburgh, for appellee.

Before NIX, C.J., and LARSEN, FLAHERTY, McDERMOTT, HUTCHINSON and ZAPPALA, JJ.

HUTCHINSON, Justice.

Appellants are a political committee, its chairman, gubernatorial candidate and a campaign worker. They appeal by allowance a Superior Court order, 335 Pa.Super. 493, 485 A.2d 1, affirming Allegheny County Common Pleas. Common Pleas had dismissed their suit for a mandatory injunction directing appellee, owner of a shopping mall, to cease interfering with appellants' political activities on appellee's

premises. Appellants claim that they have the right, under the Pennsylvania Constitution's guarantees of free speech and petition, to collect signatures on the gubernatorial candidate's nominating petition in privately-owned shopping malls and that appellee cannot deny them access to its mall for that purpose.[1]

We believe that the Pennsylvania Constitution does not guarantee access to private property for the exercise of such rights where, as here, the owner uniformly and effectively prohibits all political activities and similarly precludes the use of its property as a forum for discussion of matters of public controversy. *See Commonwealth v. Tate*, 495 Pa. 158, 432 A.2d 1382 (1981). We would therefore affirm Superior Court.

In the spring of 1982, appellants began a drive to collect signatures on nominating papers in an effort to place a candidate on that November's gubernatorial ballot. They sought permission to solicit signatures and educate the

---

1. Appellant claims rights under Article I, Sections 2, 7 and 20 of the Pennsylvania Constitution. Art. I, § 2 states:
   All power is inherent in the people, and all free governments are founded on their authority and instituted for their peace, safety and happiness. For the advancement of these ends they have at all times an inalienable and indefeasible right to alter, reform or abolish their government in such manner as they may think proper. In relevant part, art. I, § 7 provides:
   ... The free communication of thoughts and opinions is one of the invaluable rights of man, and every citizen may freely speak, write and print on any subject, being responsible for the abuse of that liberty....
   Art. I, § 20 states:
   The citizens have a right in a peaceable manner to assemble together for their common good, and to apply to those invested with the powers of government for redress of grievances or other proper purposes, by petition, address or remonstrance.
   Appellants' claim no rights under the United States Constitution. They concede that the First Amendment to the United States Constitution only protects the right of free speech against governmental restraint, not against the actions of private property owners whose property is being used for a private purpose. This concession is required by the authoritative holdings of the United States Supreme Court interpreting the First Amendment. *Hudgens v. NLRB*, 424 U.S. 507, 96 S.Ct. 1029, 47 L.Ed.2d 196 (1976); *Lloyd Corp. v. Tanner*, 407 U.S. 551, 92 S.Ct. 2219, 33 L.Ed.2d 131 (1972).

public about their cause in a shopping mall known as South Hills Village. South Hills Village is a large enclosed shopping mall in suburban Pittsburgh. The mall contains approximately one million square feet of enclosed space, hosts some 126 stores and is circumscribed by a 5000–vehicle parking lot. It was opened in 1964; appellee has owned it since 1982. The mall has a uniform policy of forbidding all political solicitation and appellants' request was denied. Rather than risk criminal prosecution by soliciting signatures in the face of this policy, appellants filed a complaint in equity in the Court of Common Pleas of Allegheny County. They sought to enjoin appellee from enforcing its no political solicitation policy on the ground that it violated their speech and petition rights under the Pennsylvania Constitution. Pa. Const., art. I, §§ 2, 7, 20.

A hearing was held before Judge (now Mr. Justice) Nicholas P. Papadakos, who entered an adjudication and decree nisi denying relief to appellants on May 28, 1982. The court *en banc* denied exceptions on October 21, 1982. Superior Court affirmed. The Court granted appellants' petition for allowance of appeal to consider the important question of whether Sections 2, 7 and 20 of Article I of the Pennsylvania Constitution impose a duty on a privately-owned shopping mall to permit political solicitation on its premises.

■ Initially, we would reject appellee's contention that this case is moot and we, therefore, lack jurisdiction. A recognized exception to the strict doctrine of mootness applies here. Although the 1982 election is over and the purpose of the activity the appellants sought to engage in on appellee's premises, securing enough signatures to place their gubernatorial candidate on the ballot, can no longer be served, this case poses important issues likely to escape review. *Wiest v. Mt. Lebanon School District,* 457 Pa. 166, 320 A.2d 362, *cert. denied,* 419 U.S. 967, 95 S.Ct. 231, 42 L.Ed.2d 183 (1974). These issues are highly unlikely to reach the appellate courts during the relatively brief campaign season. Therefore, we would reach the merits of appellants' claim.

The crux of appellants' argument is that the provisions of the Pennsylvania Constitution set out at footnote 1 of this opinion, at 1332, provide greater free speech and petition rights than the First Amendment to the United States Constitution. They assert that these greater rights include the right to solicit signatures and educate the public about their political cause in a privately-owned shopping mall.

■ In our federal system, the Constitution of the United States provides a minimum level of protection for individual rights. A state constitution may, however, provide greater protection for those rights. *Michigan v. Long*, 463 U.S. 1032, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983); *Pruneyard Shopping Center v. Robins*, 447 U.S. 74, 100 S.Ct. 2035, 64 L.Ed.2d 741 (1980). We have recognized that Pennsylvania may afford greater protection to individual rights under its Constitution. *Commonwealth v. Tate, supra;* R. Woodside, *Pennsylvania Constitutional Law*, 116–19 (1985).[2]

The primary purposes of a constitution are to establish a government, define or limit its powers and divide those powers among its parts. U.S. Const. amend. X; J. Nowak, R. Rotunda, and J. Young, *Constitutional Law*, 121 (2d Ed.1983). *See generally* 16 Am.Jur.2d, *Constitutional Law*, § 6 (1979). The United States Constitution established a government of limited and enumerated powers. Consequently, the national government possesses only those powers delegated to it. J. Nowak, *supra*, at 121. *See generally* 16 Am.Jur.2d at § 278. State constitutions, on the other hand, typically establish governments of general powers, which possess all powers not denied by the state constitution. J. Nowak, *supra*, at 121. *See generally* 16 Am.Jur.2d at § 16. Our state constitution functions this way and restrains these general powers by a Declaration of

---

**2.** We note in this connection that two conflicting individual rights are implicated in this case, *viz.* "property" and "political speech." Art. I, § 1 guarantees "certain inherent and indefeasible rights" including the right of "acquiring, possessing and protecting property[.]" For the reasons set forth below, the absence of governmental action on this record makes it unnecessary for us to balance these interests, as appellants contend.

Rights. R. Woodside, *supra*, at 3, 113; *Commonwealth v. Wormser*, 260 Pa. 44, 46, 103 A. 500, 501 (1918) (the legislature may enact all laws not forbidden by the state constitution).

The Pennsylvania Constitution of 1776, our first post-colonial constitution, illustrates Pennsylvania's basic constitutional scheme. It contains two parts: one which establishes a government and one which limits its powers. The first part, titled Declaration of Rights of Inhabitants of the Commonwealth or State of Pennsylvania, contains most of the language found in our present Article I. The second, titled Plan or Frame of Government for the Commonwealth or State of Pennsylvania, establishes a governmental system. This simple two-part format in itself evinces the draftsmen's intent to establish a government and to limit its powers, R. Woodside, *supra*, at 114, in consonance with their known adherences to the theories of Locke, Montesquieu and other natural law philosophers. J. Selsam, *The Pennsylvania Constitution of 1776*, 176 (1936). Additionally, § 46 of the Frame of Government acknowledges the limitations on governmental power by stating:

> The Declaration of Rights is hereby declared to be a part of the constitution of this commonwealth, and ought never to be violated on any pretense whatever.

Pa. Const. of 1776, Frame of Government, § 46. *See* T. White, *Commentaries on the Constitution of Pennsylvania*, 171 (1901).

By 1790, the government established by the Constitution of 1776 proved unworkable and the legislature authorized a new constitutional convention. T. White, *supra*, at xxiv–xxv. The resolution authorizing this convention included in the five topics to be addressed a call for alterations and amendments to the Declaration of Rights. The fifth topic read:

> V. That that part of the constitution of this commonwealth called "A declaration of the rights of the inhabitants of the Commonwealth or State of Pennsylvania," requires alterations and amendments, in such manner as

that the *rights of the people, reserved and excepted out of the general powers of government, may be more accurately defined and secured* [.] ...."

T. White, *supra,* at xxv (emphasis supplied).

Nevertheless, the Declaration of Rights was not substantively changed by the convention, although Section 46 of the 1776 Constitution's Frame of Government was rephrased and moved into the Declaration of Rights without material change as Article IX, Section 26. It now reads as it did then:

To guard against transgressions of the high powers which we have delegated, we declare that everything in this article *is excepted out of the general powers of government and shall forever remain inviolate.*

Pa. Const. of 1790, art. IX, § 26 (emphasis supplied) (renumbered without change at art. I, § 25). Subsequent conventions and amendments have left this frame of government, T. White, *supra,* at xxv, and the Declaration of Rights materially unchanged today. R. Woodside, *supra,* at 114.

■ Considering the foregoing history, we conclude that the Declaration of Rights is a limitation on the power of state government. *Accord* R. Woodside, *supra,* at 113. The Pennsylvania Constitution did not create these rights. The Declaration of Rights assumes their existence as inherent in man's nature. It prohibits the government from intefering with them and leaves adjustment of the inevitable conflicts among them to private interaction, so long as that interaction is peaceable and non-violent. This Court has consistently held this view, that the Pennsylvania Constitution's Declaration of Rights is a limit on our state government's general power. *O'Neill v. White,* 343 Pa. 96, 22 A.2d 25 (1941). *Commonwealth ex rel. Smillie v. McElwee,* 327 Pa. 148, 193 A. 628 (1937); *Commonwealth ex rel. McCormick v. Reeder,* 171 Pa. 505, 33 A. 67 (1895). It has also followed this premise in holding that particular sections of the Declaration of Rights represent specific limits on governmental power. Thus, in *William Goldman Theatres, Inc. v. Dana,* 405 Pa. 83, 173 A.2d 59, *cert. denied,*

368 U.S. 897, 82 S.Ct. 174, 7 L.Ed.2d 93 (1961), the Court held that Article I, Section 7 prevents Commonwealth agencies from imposing prior restraints on the communication of thoughts and opinions of individuals. Therein we stated:

> Although the provision in Article I, § 7, of the Pennsylvania Constitution, as above quoted, has never heretofore been interpreted by this court in present context, it is clear enough that what it was designed to do was to prohibit the imposition of prior restraints upon the communication of thoughts and opinions, leaving the utterer liable only for an abuse of the privilege. History supports this view.

*Id.*, 405 Pa. at 88, 173 A.2d at 62.[3]

We are not suggesting that the rights enumerated in the Declaration of Rights exist only against the state. These rights are specifically reserved to the people; each inhabitant of the Commonwealth, including appellants, appellee and other users of the mall, shares in them and enjoys them. The framers of our constitution considered them basic rights of human beings; we have called them "the Hallmarks of Western Civilization." *Andress v. Zoning Board of Adjustment*, 410 Pa. 77, 86, 188 A.2d 709, 713 (1963). They are not created by the constitution, but preserved by it. *Spayd v. Ringing Rock Lodge*, 270 Pa. 67, 113 A. 70 (1921).

We believe, however, the adjustment of these rights among private parties is not necessarily a matter of constitutional dimensions. If it were, significant governmental intrusion into private individuals' affairs and relations would be likely to routinely occur. This intrusion itself would deprive individuals of important rights of freedom. Free people regulate their private affairs through individual adjustment. We should be wary of insulating that development against legislative, judicial or private change by ensh-

3. For similar language *see Willing v. Mazzocone*, 482 Pa. 377, 393 A.2d 1155 (1978) (Opinion Announcing the Judgment of the Court) (dealing with art. I, § 7); *Commonwealth v. National Gettysburg Battlefield Tower, Inc.*, 454 Pa. 193, 311 A.2d 588 (1973) (Opinion Announcing the Judgment of the Court) (dealing with art. I, § 27).

rining a particular position in the text of the constitution. Social and economic developments require a flexible legal framework which can adapt to them. Our common law provides such a framework.

■ The drafters of the constitution assumed the existence of a body of civil law, common and statutory, which governs violations of rights and breaches of duties between individuals.[4] Constitutions, long-lasting and difficult to change, primarily govern relationships between an individual and the state. The civil law, which must permit flexible and continuing development as society changes, primarily governs relationships between individuals.

The social and economic development with which we are concerned here is the ongoing substitution of enclosed shopping malls for individual retail stores clustered in downtown shopping areas. These stores were themselves substitutes for the open sheds of the colonial market which was generally located on public ground. Despite these developments in the past two hundred years, common law has not yet given an individual the general right to enter upon the private property of another. *Kopka v. Bell Telephone Co. of Pa.*, 371 Pa. 444, 91 A.2d 232 (1952); *Hobbs v. Geiss*, 13 S & R 417 (1826). Moreover, even if invited for one purpose, the invitee has no recognized right to engage in another activity against the landowner's wishes. *Commonwealth v. Johnston*, 438 Pa. 485, 263 A.2d 376 (1970). Here, the public at large, including appellants, were invited to South Hills Village for commercial purposes: shopping, dining and entertainment. Political solicitation was uniformly forbidden.

■ Appellants' argument that shopping malls have usurped the function of "Main Street, U.S.A." and town

---

**4.** The 1776 Constitution established courts for the settlement of disputes between individuals and guaranteed the right to jury trial consistent with former practice. Pa. Const. of 1776, Declaration of Rights, § 11; Frame of Government, §§ 4, 25. *See also Commonwealth v. Reilly*, 324 Pa. 558, 188 A. 574 (1936); *Byers v. Commonwealth*, 42 Pa. 89 (1862).

business districts is not lost on us.  Both statistics and common experience show that business districts, particularly in small and medium sized towns, have suffered a marked decline.  At the same time, shopping malls, replete with creature comforts, have boomed.  These malls have begun to serve as social as well as commercial outlets for the communities they serve.  Young people often come to a mall to socialize with their peers.  Older people come to enjoy the parklike atmosphere offered in many malls or to view displays erected in the corridors.  Members of the community have an opportunity by chance or design to mix, meet and converse.  However, these social benefits are ancillary to the commercial purpose of shopping malls and do not involve organized campaigns on particular issues by political or special interest groups.  Law and sociology are not coextensive.  Though shopping malls may fulfill some of the societal functions of the traditional main street or town market place, we do not believe that this makes them their legal equivalent.  Nor does it yet require them to provide a political forum for persons or groups with views on public issues, so long as the owner does not grant unfair advantage to particular interests or groups by making his premises arbitrarily available to those he favors while excluding all others.[5]  *See Commonwealth v. Tate, supra.*

Appellants argue that our decision in *Commonwealth v. Tate, supra,* controls this case.  We agree that it controls.  However, it does not help these appellants.  In our view, it demonstrates a limiting rationale for applying our constitution's rights of speech and assembly to property private in name but used in fact as a forum for public debate.  In *Tate,* a private institution of higher learning sponsored a community anti-crime symposium which included a speech by then FBI Director Clarence Kelley.  The symposium was open to the public; in fact, the public was encouraged to attend.  Appellants, the Lehigh-Pocono Committee of Concern (LEPOCO), sought to peacefully protest against Di-

5.  This caveat does not apply to non-political, charitable groups.  A mall owner may pick and choose among them because political solicitation is not involved.

rector Kelley because of his refusal to supply them with information they had requested under the Freedom of Information Act, 5 U.S.C.A. § 552 (1982), and to protest generally against FBI policies. The College summarily denied LEPOCO's request for a permit; apparently no criteria for granting or denying permits existed. On the day of Director Kelley's speech, members of LEPOCO entered the campus and peacefully distributed leaflets near the auditorium. Twice college officials and the police asked them to leave; they refused. The protesters were arrested for defiant trespass, 18 Pa.C.S. § 3503(b). We held that LEPOCO members had a right to speak freely without fear of criminal conviction under art. I, § 7 of the Pennsylvania Constitution, because the college had made itself into a public forum and 18 Pa.C.S. § 3503(c)(2) provided a defense to a charge of defiant trespass in those circumstances.[6]

Muhlenberg College not only permitted the public to walk its campus freely and use many of its facilities; it also permitted the Muhlenberg Board of Associates to hold public events on campus for the benefit of the community, thereby enhancing the college's reputation. But the "Citizens' Crusade Against Crime" in March of 1976 did more than benefit the community and college. It also provided a public forum for the Director of the F.B.I., then a controversial public figure . . . . .

Through public advertisements, the Board of Associates assembled a public audience on the Muhlenberg College campus to hear F.B.I. Director Kelley present his views. In these circumstances, the college could not, consistent with the invaluable rights to freedom of speech, assembly, and petition constitutionally guaran-

---

6. *Tate* relies in part on Section 3503(c)(2) of the Crimes Code, 18 Pa.C.S. § 3503(c)(2), which states:

It is a defense to prosecution under this section that: the premises were at the time open to members of the public and the actor complied with all lawful conditions imposed on access to or remaining on the premises.

This case involves a request for affirmative state action to open private property to appellants' activities, not a defense against governmental prosecution for them.

teed by this Commonwealth to its citizens, exercise its right of property to invoke a standardless permit requirement and the state's defiant trespass law to prevent appellants from peacefully presenting their point of view to this indisputably relevant audience in an area of the college normally open to the public.

*Id.,* 495 Pa. at 174–75, 432 A.2d at 1390–91.

South Hills Village, on the other hand, has not made itself a public forum in this manner. Appellee has invited the public at large into the mall only for commercial purposes. By adhering to a strict no political solicitation policy, appellee has uniformly and generally prevented the mall from becoming a public forum. South Hills Village is operated as a market place for the exchange of goods and services but not as a market place for the exchange of ideas. Therefore, the *Tate* analysis does not support appellant's claim.

Similarly, the company town analysis embraced by the United States Supreme Court in *Marsh v. Alabama,* 326 U.S. 501, 66 S.Ct. 276, 90 L.Ed. 265 (1946), is inapplicable. The United States Supreme Court has not applied the *Marsh* rationale to shopping malls as a matter of federal constitutional law. *Hudgens v. NLRB, supra; Lloyd Corp. v. Tanner, supra.* We believe that refusal is correct and find it persuasive under our own constitution. The appellant in *Marsh,* a Jehovah's Witness, sought to distribute religious literature on the streets of Chickasaw, Mississippi. Chickasaw was a company town; it was fully owned by a private corporation. All solicitation was forbidden by the town's management. Appellant refused to leave and was arrested for criminal trespass. The United States Supreme Court found that the town of Chickasaw performed all of the normal municipal functions, and other than the fact that the land was titled to a private corporation, it was indistinguishable from a municipality. 326 U.S. at 502–03, 66 S.Ct. at 276–77. The Court held that an entity which functions as a municipal government cannot abridge constitutionally-

guaranteed rights regardless of the town's ownership. 326 U.S. at 507–09, 66 S.Ct. at 279–80.

A shopping mall is not equivalent to a town. Though it duplicates the commercial function traditionally associated with a town's business district or marketplace, the similarity ends there. People do not live in shopping malls. Malls do not provide essential public services · such as water, sewers, roads, sanitation or vital records, nor are they responsible for education, recreation or transportation. Thus, the *Marsh* analysis is not applicable to the instant case.

■ We are aware that the Supreme Court of California has held that the petition and free speech provisions of its constitution confer a positive right to solicit signatures for political purposes in a privately owned shopping mall. *Robins v. Pruneyard Shopping Center*, 23 Cal.3d 899, 153 Cal.Rptr. 854, 592 P.2d 341 (1979), *aff'd*. 447 U.S. 74, 100 S.Ct. 2035, 64 L.Ed.2d 741 (1980). Those provisions are substantially the same as our own. Although the facts of *Pruneyard* are almost identical to this case,[7] the *Pruneyard* rationale is grounded in California law. The California Court, after generally observing that free speech and petition rights are very important in California, 153 Cal. Rptr. at 858–59, 592 P.2d at 345–46, pointed to provisions of the California Constitution[8] similar to ours and held them more expansive than the First Amendment to the United

7. *Pruneyard, supra,* dealt with a large enclosed shopping mall with a uniform no political solicitation policy. A group of high school students sought to collect signatures on a petition opposing an United Nations resolution condemning "Zionism." The students were asked to leave by the mall's security officers and brought a suit to enjoin the enforcement of the mall's regulation. 153 Cal.Rptr. at 855, 592 P.2d at 342.

8. "Every person may freely speak, write and publish his or her sentiments on all subjects, being responsible for the abuse of this right. A law may not restrain or abridge liberty of speech and press." Cal. Const., art. I, § 2.

"[P]eople have the right to ... petition government for redress of grievances...." *Id.* at art. I, § 3.

The California Constitution also has provisions for direct public action: initiative, referendum and recall. *Id.* at art. I, §§ 8, 9 and 13.

States Constitution. *Id.* 153 Cal.Rptr. at 859, 592 P.2d at 346. We agree with the California Court that these rights are basic and important. We also believe the text of our constitution, like theirs, indicates a more expansive protection than the First Amendment. Indeed, we implicitly recognized that in *Tate.* However, we cannot agree with *Pruneyard's* holding that the state, as a matter of positive law, may constitutionally interfere with a private person who uniformly precludes political activities on his property.

The highest courts of other jurisdictions are divided on this issue. In a plurality decision, the Washington Supreme Court stated that the speech and petition provisions of the Washington Constitution were modeled on the California Constitution and entered an order consistent with *Pruneyard. Alderwood Associates v. Washington Environmental Council,* 96 Wash.2d 230, 635 P.2d 108 (1981).

The Supreme Judicial Court of Massachusetts has also held that its state constitution confers a right to solicit signatures in a shopping mall. *Batchelder v. Allied Stores International, Inc.,* 388 Mass. 83, 445 N.E.2d 590 (1983). It based its decision on the right to petition and seek office. The language of this section of the Massachusetts Constitution [9] is substantially different from the language in Article I, Section 20 of the Pennsylvania Constitution. The court did not reach the free speech provision.

Unlike California, Massachusetts and Washington, other sister jurisdictions in addressing these situations have reached the result we do today. We believe that their position is more nearly correct. The Connecticut Supreme Court in *Cologne v. Westfarms Associates,* 192 Conn. 48, 469 A.2d 1201 (1984), held that the Connecticut Constitution did not confer a right to solicit signatures in a privately owned shopping mall. The court rejected the *Pruneyard* analysis and held that the history of the Connecticut Consti-

**9.** Article 9 of the Massachusetts Declaration of Rights states:
All elections ought to be free; and all the inhabitants of this Commonwealth, having such qualifications as they shall establish by their frame of government, have an equal right to elect officers, and to be elected, for public employments.

tution shows that their Declaration of Rights is a restraint on the government and does not confer positive rights. The court also refused to exercise the state's police power, in deference to the legislature.

In *Woodland v. Michigan Citizens Lobby,* 423 Mich. 188, 378 N.W.2d 337 (1985), the Michigan Supreme Court also found no right to solicit signatures in a shopping mall under its constitution. The court held that the Michigan Constitution is a restraint on governmental inteference with rights. It discussed and rejected both *Pruneyard, supra,* and *Alderwood, supra,* and refused to invade the legislature's domain by exercising the state's police powers.[10]

The California Supreme Court in *Pruneyard* utilized that state's police power to regulate property in the public interest and held that appellants had a right to solicit signatures in a privately owned shopping center. 153 Cal. Rptr. at 860, 592 P.2d at 347. It analogized this exercise of police power in the name of free speech to regulation of private property to further other public interests such as zoning, public health and safety and environmental protection. *Id.,* 153 Cal.Rptr. at 857–59, 592 P.2d at 344–46.

▪ The Commonwealth of Pennsylvania through its police powers may also constitutionally regulate private property's use in the public interest, *Best v. Zoning Board of Adjustment,* 393 Pa. 106, 108, 141 A.2d 606, 608 (1958). However, such an exercise of the Commonwealth's police power is exclusively within the legislative domain. Pa. Const., art. II, § 1; *Mt. Lebanon v. County Board of Elections,* 470 Pa. 317, 368 A.2d 648 (1977). *See Cologne v. Westfarms Associates, supra; Woodland v. Michigan Citizens Lobby, supra.* Like the Connecticut and Michigan Supreme Courts, we are not free under our constitution to follow the California Supreme Court in this area.

**10.** The North Carolina Supreme Court has also considered this question. *State v. Felmet,* 302 N.C. 173, 273 S.E.2d 708 (1981). The court held that it would not find a state constitutional right to solicit signatures in a privately owned shopping center parking lot. However, the opinion did not discuss the issue at length.

Underlying the California Supreme Court's decision is an analysis of its constitution in terms of positive law. That jurisprudential theory is inconsistent with our constitution's historical basis in natural law. The California rationale also seems to assume that a mall owner may freely exclude all political solicitation, including solicitation on behalf of generally approved groups and ideas, without suffering commercial harm at the hands of competitors who would seek to increase good will and customers by inviting local organizations with generally approved political or social programs into their confines. We are not prepared to make that assumption. We believe that in the area of individual right the forces of competition are more likely than government inteference and regulation to open up our malls to peaceful political activity by all groups. The *Tate* analysis facilitates this adjustment.

We believe that this discussion and analysis reflects both the language and the spirit of the Pennsylvania Constitution. It provides a framework for logical reconciliation of the conflicting rights, one that protects those rights and at the same time avoids the invocation of increased government intervention in the name of individual liberty.

The order of Superior Court is affirmed.

LARSEN and ZAPPALA, JJ., file concurring opinions.

McDERMOTT, J., concurs in the result and files a concurring opinion.

NIX, C.J., files a concurring and dissenting opinion.

PAPADAKOS, J., did not participate in the consideration or decision of this case.

LARSEN, Justice, concurring.

For the reasons expressed in my dissenting opinion in *Commonwealth v. Tate*, 495 Pa. 158, 176–77, 432 A.2d 1382, 1391–92 (1981), I would affirm the order of the Superior Court. As I stated in *Tate:*

Every citizen of this country and Commonwealth has a right to hold whatever political, religious, social and philosophical beliefs and viewpoints that he or she chooses, and should also be free to entertain similar-minded persons on their own private property and domain without interference from others. Muhlenberg College is a private corporation and, as such and like all other private citizens of this Commonwealth, should have the right to invite whom it wishes onto its own property and to exclude any other private persons from entering on that property. To carve out exceptions to this right and to engage in the majority's "balancing" of constitutional interests vis-a-vis private citizens creates for property owners confusion and uncertainty in the law, and chills the exercise of property rights.

*Id.*, 495 Pa. at 176–77, 432 A.2d at 1391.

ZAPPALA, Justice, concurring.

I concur in the Court's judgment affirming the determination of the courts below that the Appellants were not entitled to have the Appellee enjoined from denying them access to its property. Because I have serious doubts about the wisdom of *Commonwealth v. Tate*, 495 Pa. 158, 432 A.2d 1382 (1981), and the breadth of its language, to the extent that the plurality opinion approves and relies on the reasoning of that case I do not join. On the facts presented, however, I find it unnecessary to further explore *Tate*.

On the whole I agree with the outline of the grand scheme of governmental powers described in the plurality opinion. The federal government possesses limited powers delegated by the states and enumerated in the United States Constitution. The state government possesses general powers founded on the authority of the people, with the exception of certain matters as to which the powers of the state are limited and the rights of the people are declared inviolable. I further agree that our Constitution's Declaration of Rights, and each of its sections, primarily governs relationships between the individual and the state, by way of setting limits on the state government's general power;

the civil law primarily governs relationships between and among individuals. Where conditions evidence a need for something more than individual *ad hoc* adjustment of rights, it is ordinarily for the legislature to fashion *a priori* rules of conduct, and for the courts to assess conduct *post hoc* according to established normative precepts.

As does the plurality opinion, I find *Tate* distinguishable at least insofar as it involved the affirmative defense to a charge of defiant trespass found in 18 Pa.C.S. § 3503(b). See at 1336, n. 5. This statute expresses the legislative judgment, of the type discussed above, that *in some conditions* private property interests are not protected by the power of the state to impose criminal penalties. Those conditions are that the property was "at the time open to members of the public" and that the actor "complied with all lawful conditions imposed on access to or remaining on the premises."

Because this case does not involve a criminal prosecution or the Section 3503(b) defense, and because it involves a total ban on access to the premises for purposes of solicitation, it is not an appropriate case to address the difficult issue of what requirements must be adhered to in order for conditions to be "lawful". I am skeptical, however, of the step in the reasoning of *Tate* by which the Court assumed that "lawful conditions" imposed by an owner of private property must necessarily be consistent with the limitations on government action dictated by the First Amendment and Article 1, § 7. *See* 495 Pa. at 174, 432 A.2d at 1390. I am likewise hesitant to join the unexplained implication in the plurality opinion that in order for conditions on access to be acceptable they must "not grant unfair advantage to particular interest groups" or make the premises "arbitrarily available to [some] while excluding all others." At 33.

In the present case we need say no more than this: the individual property owner has determined not to allow any persons onto its property for purposes of solicitation; the legislature has not seen fit to regulate the right of property ownership so as to require an owner to permit entry for

these purposes; and no tenet of the common law either directly or by analogy establishes the asserted speech and assembly rights as preeminent over the right of maintaining the close of private property. The Appellants, therefore, have no affirmative legal right to enter the appellee's property on which the injunction sought could have been granted.

McDERMOTT, Justice, concurring.

The issue before us is whether one who invites the public to his property for commercial purposes is required to allow others to use the land and occasion to express, or solicit for, their world views. Had we not been treated to the poristic thickets in the plurality's disquisition we might, under the specific facts of this case, have said plainly that the answer is NO, leaving the ifs, ands, buts, or maybes to other factual contexts.

We should not lose sight of the fact that persons who own and operate shopping malls are merchants. As such they should not be required to provide forum, place, or occasion for speech making, petition signing, parades, or cracker barrels, to discuss local or global events. They are in business for business sake. They are not municipalities, states, or villages, and however romantic it may be to believe that the public repair to these galvanic places, of a Saturday morning, for more than bread and salt, they are not yet instruments of the state.

I concur only in the result.[1]

NIX, Chief Justice, concurring and dissenting.

The Opinion Announcing the Judgment of the Court persuasively argues that, unlike its federal counterpart, the Declaration of Rights contained in Article I of our Constitution "assumes their existence as inherent in a man's nature." At 30. I join in the conclusion that "[t]hese rights are specifically reserved to the people; *each inhabitant of*

1. Neither am I prepared to accept the reasoning of *Commonwealth v. Tate*, 495 Pa. 158, 432 A.2d 1382 (1981) under the present facts.

*the Commonwealth, . . . .*" (emphasis added). At 31. Thus, the limitation in federal constitutional decisions to matters involving "state action" is not applicable in an analysis where it is alleged that one of these rights conferred under our constitution has been violated. *See Hartford Accident and Indemnity Co. v. Insurance Commissioner of Commonwealth,* 505 Pa. 571, 585, 482 A.2d 542, 549 (1984). (Language of Pennsylvania Constitution, not "state action" test, controls its applicability.) To this extent, I am in complete agreement with the view expressed in the Opinion Announcing the Judgment of the Court.

My departure begins with the statement, "[t]he adjustment of these rights among private parties, however, is not necessarily a matter of constitutional dimensions." At 1335. When it is applied in this situation, where the issue requires a definition of the right in a given context, it is obviously a question of constitutional dimension. Once a constitutional right is recognized, any claim that its protection has been denied requires a determination of the breadth of that protection. The most frivolous claim of an illegal search, denial of free speech, deprivation of due process, etc., still requires decisions with constitutional implications.

This initial disagreement occasions my further departure from the suggested analysis employed by the plurality in adjusting these constitutional disputes between individuals. As recognized in *Commonwealth v. Tate,* 495 Pa. 158, 432 A.2d 1382 (1981), a balancing process is required which should attempt to maximize each side's enjoyment of the respective rights claimed. Such an accommodation requires careful analysis. An implied premise that private ownership must prevail is antithetical to the objective that should be achieved.

Private ownership is a generic term for many different relationships. For instance, it embraces residences, nonprofit ventures, and purely commercial ventures; it also encompasses different levels of public involvement. In this instance we are faced with the type of private ownership

which is comparable to the main commercial area in a given community, a place that has traditionally been an accepted forum for the appropriate expression and exchange of ideas, political and otherwise. The mere fact that it is privately owned should not be the controlling factor in the judgment to be made in this decision. Political expression, even though it may be unpopular at any given time, is certainly one of the rights that fall within the penumbra of rights articulated under our Declaration of Rights. When it is established that it is done in an unobtrusive and orderly fashion, without harrassment to those who do not wish to engage in such an exchange, I do not find the basis for concluding that the mere fact that the area is privately owned would necessarily preclude the activity.

Accordingly, I believe that we should direct our trial courts to employ the balancing test in future cases such as these to attempt to accommodate the competing interests.