[No. 55952–0. En Banc. October 19, 1989.]

SOUTHCENTER JOINT VENTURE, ET AL, *Respondents,* v.
NATIONAL DEMOCRATIC POLICY COMMITTEE,
ET AL, *Appellants.*

414

*Richard B. Sanders,* for appellants.

*Ferguson & Burdell,* by *Henry C. Jameson* and *Alan Bornstein,* for respondents.

*Peter J. Eglick* and *Robert R. Meinig* on behalf of the American Civil Liberties Union, amici curiae for appellants.

*James B. Stoetzer* and *Michael B. King* on behalf of Northgate Shopping Center and Merchants Association and Tacoma Mall Merchants Association, amici curiae for respondents.

ANDERSEN, J.—

FACTS OF CASE

This case presents the question of whether a political organization has a right under the free speech provision of the Constitution of the State of Washington to solicit contributions and sell literature in a *privately owned* shopping mall. We conclude that it does not.

Southcenter Joint Venture (Southcenter) owns the Southcenter Shopping Center, an enclosed shopping mall

comprised of numerous retail stores. The Southcenter Shopping Center will be referred to herein simply as the "mall". Southcenter acquired the mall from its previous owner in December of 1985. At all times pertinent herein, it maintained a policy of allowing charitable, civic and political groups to use designated "public service centers" within the mall. Southcenter promulgated regulations governing the use of these areas by such outside groups. These regulations required that groups wishing to use the public service centers first submit an application to do so. One of the regulations prohibited solicitation of funds in the mall.

On June 20, 1986, an organization named the National Democratic Policy Committee (NDPC) submitted an application requesting the use of a public service center. The NDPC is a political organization apparently devoted to advancing the political views of one Lyndon LaRouche. Despite its name, the NDPC is not affiliated with the Democratic Party.

In its application, the NDPC stated that it wished to use a public service center for the purposes of distributing literature, signing up members, and soliciting contributions. Southcenter denied the application due to its regulation against soliciting funds. This prompted an attorney representing the NDPC to inform Southcenter that he considered the NDPC's right to solicit funds at the mall to have been established when it prevailed in an earlier civil action brought against it by the previous mall owner. The attorney also told Southcenter that he would advise his clients to be present in the mall "at such times and places as they deem appropriate".

In the afternoon of July 17, 1986, four individuals who were members of, or affiliated with, the NDPC appeared unannounced at the mall and undertook to solicit contributions and sell literature. The mall's assistant manager asked them to leave, but they refused. Later that afternoon, they left the mall of their own accord.

Southcenter subsequently brought an action in the Superior Court against the NDPC and the four individuals who

had appeared at the mall. For convenience, the NDPC and these four individuals are hereinafter collectively referred to as the "NDPC". By its action, Southcenter sought a judgment declaring that the NDPC had no right either to solicit funds at the mall or violate Southcenter's other rules concerning the use of its premises. Southcenter then sought issuance of a preliminary injunction and the Superior Court granted it. The NDPC answered Southcenter's complaint and counterclaimed, alleging defamation for a statement contained in the mall manager's affidavit supporting the injunction, stating that "one of the individuals sitting at the NDPC card table wore a swastika–type symbol on his arm." Southcenter moved for summary judgment in its favor, and the NDPC also moved for partial summary judgment.

The Superior Court granted Southcenter's motion and entered judgment permanently enjoining the NDPC from soliciting contributions or selling literature on the mall premises without Southcenter's consent. The NDPC then sought further review. The Court of Appeals certified the case to this court for determination and we accepted certification.[1]

This case presents us with three issues.

## ISSUES

ISSUE ONE. Does the doctrine of collateral estoppel apply so as to prevent relitigation of issues raised in a prior action brought by the previous mall owner against the NDPC?

ISSUE TWO. Under the free speech provision of the Constitution of the State of Washington, does a political organization have the constitutional right to solicit contributions and sell literature at a privately owned shopping mall?

ISSUE THREE. Did the trial court err by dismissing the NDPC's counterclaim for defamation?

[1] RCW 2.06.030(d).

## DECISION

ISSUE ONE.

CONCLUSION. The doctrine of collateral estoppel does not apply in this action because Southcenter is not in privity with a party to the prior litigation.

The NDPC first contends that the doctrine of collateral estoppel applies here. Its contention is based on the fact that issues similar to those raised in this case were litigated in an action brought by the previous mall owner against the NDPC in 1984. In the earlier case, the NDPC prevailed in the Superior Court and the then mall owner did not appeal.

The following elements are required for application of the doctrine of collateral estoppel:

> (1) identical issues; (2) a final judgment on the merits; (3) the party against whom the plea is asserted must have been a party to or in privity with a party to the prior adjudication; and (4) application of the doctrine must not work an injustice on the party against whom the doctrine is to be applied.

*Shoemaker v. Bremerton,* 109 Wn.2d 504, 507, 745 P.2d 858 (1987) (quoting *Malland v. Department of Retirement Sys.,* 103 Wn.2d 484, 489, 694 P.2d 16 (1985)).

Southcenter asserts that the doctrine of collateral estoppel does not apply here because, among other things, collateral estoppel element 3 is absent in that Southcenter was not a party to or in privity with a party to the prior adjudication. We agree. It is true that Southcenter did acquire the mall from a party to the prior action. It is also true that a successor in interest to a party to an action that determines interests in property is subject to the preclusive effects of that action.[2] That rule, however, is not applicable where the previous action involved a "personal" right, as opposed to a "property" right.[3]

---

[2] Restatement (Second) of Judgments § 43(1)(b) (1982). *See also McKown v. Driver,* 54 Wn.2d 46, 54, 337 P.2d 1068 (1959); *Watkins v. Siler Logging Co.,* 9 Wn.2d 703, 721, 116 P.2d 315 (1941).

[3] Restatement (Second) of Judgments § 43, comment *a.*

In the prior action, the parties disputed whether the NDPC had a free speech right to solicit contributions and sell literature at the mall. We conclude that a constitutional right of free speech in a case of this sort is more appropriately classified as a "personal" right than a "property" right. This is because such a right is not unique to the particular shopping mall involved, nor does it affect the title thereto.[4]

█ Thus, since the previous action involved a personal right, Southcenter is not in privity with a party to the prior adjudication and collateral estoppel does not apply to prevent relitigation of issues raised in the previous action. This conclusion is bolstered by our rule that the relitigation of an important issue of law should not be foreclosed by collateral estoppel.[5]

ISSUE TWO.

CONCLUSION. The free speech provision of the Constitution of the State of Washington (Const. art. 1, § 5) affords protection to the individual against actions of the State. It does not protect an individual against the actions of other private individuals. The free speech provision of our state constitution thus does not afford the NDPC a constitutional right to solicit contributions and sell literature at the mall.

It is the NDPC's next contention that it has a free speech right to solicit contributions and sell literature at the mall. It is, of course, true that the oral and written dissemination of one's views is protected by the first amendment to the United States Constitution.[6] Such protection is not lost

[4]*See Watkins,* at 722.

[5]*Kennedy v. Seattle,* 94 Wn.2d 376, 379, 617 P.2d 713 (1980).

[6]U.S. Const. amend. 1; *Heffron v. International Soc'y for Krishna Consciousness, Inc.,* 452 U.S. 640, 647, 69 L. Ed. 2d 298, 101 S. Ct. 2559 (1981).

when written materials are sold or contributions are solicited in the course thereof.[7] Thus, according to the NDPC's arguments, its activities at the mall constitute protected speech.

In the case of *Lloyd Corp. v. Tanner,* 407 U.S. 551, 33 L. Ed. 2d 131, 92 S. Ct. 2219 (1972), however, the United States Supreme Court held that the first amendment to the United States Constitution did not protect the distribution of political handbills in a privately owned shopping mall. In so holding, it stressed that

> the First and Fourteenth Amendments safeguard the rights of free speech and assembly by limitations on state action, not on action by the owner of private property used nondiscriminatorily for private purposes only.

*Lloyd,* 407 U.S. at 567. The Court in *Lloyd* also firmly rejected the argument that the mall had lost its private character because it was open to the public and served the same purpose as a business district.[8] The United States Supreme Court thereby repudiated the position it had taken in the earlier case of *Amalgamated Food Employees Union Local 590 v. Logan Vly. Plaza, Inc.,* 391 U.S. 308, 20 L. Ed. 2d 603, 88 S. Ct. 1601 (1968).[9]

██ A state may, of course, "adopt in its own Constitution individual liberties more expansive than those conferred by the Federal Constitution." *Pruneyard Shopping Ctr. v. Robins,* 447 U.S. 74, 81, 64 L. Ed. 2d 741, 100 S. Ct. 2035 (1980).[10] The NDPC urges us to so construe the free

---

[7]*Heffron,* 452 U.S. at 647; *Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Coun., Inc.,* 425 U.S. 748, 761, 48 L. Ed. 2d 346, 96 S. Ct. 1817 (1976).

[8]*Lloyd Corp. v. Tanner,* 407 U.S. 551, 568–69, 33 L. Ed. 2d 131, 92 S. Ct. 2219 (1972).

[9]*See also Hudgens v. NLRB,* 424 U.S. 507, 518–20, 47 L. Ed. 2d 196, 96 S. Ct. 1029 (1976) (following *Lloyd*).

[10]*See also State v. Gunwall,* 106 Wn.2d 54, 59, 720 P.2d 808 (1986) (quoting same).

speech provision of the Constitution of the State of Washington (Const. art. 1, § 5) and conclude that it affords the NDPC the right to solicit contributions and sell literature at the mall. Indeed, we have previously construed this state's constitutional free speech provision to afford greater protection of individual liberties than its federal counterpart.[11] The NDPC, however, is not just asking us to cast a more expansive interpretation of the state constitutional provision; in reality, it is asking us to declare that our state constitution grants *an entirely new kind* of free speech right—one that can be used not only as a shield by private individuals against actions of the state but also as a sword against other private individuals.[12] This we cannot do.

To adopt the position urged by the NDPC would require us to act contrary to the fundamental nature of our own state constitution. Under the American system of government, sovereignty resides in the people.[13] It is the people who ordain a constitution.[14] A constitution, in turn, is "that body of rules and maxims in accordance with which the powers of sovereignty are habitually exercised." 1 T. Cooley, *Constitutional Limitations* 4 (8th ed. 1927).[15] The whole significance of a constitutional government is that its

---

[11]*See O'Day v. King Cy.,* 109 Wn.2d 796, 802, 749 P.2d 142 (1988); *Bering v. Share,* 106 Wn.2d 212, 234, 721 P.2d 918 (1986), *cert. dismissed,* 479 U.S. 1050 (1987); *State v. Coe,* 101 Wn.2d 364, 679 P.2d 353 (1984).

[12]*See Alderwood Assocs. v. Washington Envtl. Coun.,* 96 Wn.2d 230, 250, 635 P.2d 108 (1981) (Dolliver, J., concurring).

[13]1 T. Cooley, *Constitutional Limitations* 81 (8th ed. 1927); H. Black, *American Constitutional Law* 23 (4th ed. 1927).

[14]U.S. Const. preamble; Wash. Const. preamble; 1 T. Cooley, at 81; 1 J. Story, *Commentaries on the Constitution of the United States* 243 (5th ed. 1891).

[15]A more comprehensive definition of a constitution is that:
[t]he constitution of a state is the fundamental law of the state, containing the principles upon which the government is founded, and regulating the division of the sovereign powers, directing to what persons each of those powers is to be confided and the manner in which it is to be exercised.
H. Black, at 1–2. *See also* 1 T. Cooley, at 4.

fundamental rules or maxims not only locate the *sovereign power* in individuals or bodies designated or chosen in some prescribed manner, but also *define the limits of its exercise so as to protect individual rights, and shield them against the assumption of arbitrary power.*

(Italics ours.) 1 T. Cooley, at 5.[16] It is also axiomatic that

[t]he constitution, moreover, is in the nature of a covenant of the sovereign people with each individual thereof, under which, while they intrust the powers of government to political agencies, they also divest themselves of the sovereign power of making changes in the fundamental law except by the method in the constitution agreed upon.

T. Cooley, *General Principles of Constitutional Law* 23 (3d ed. 1898). It follows that the fundamental nature of a constitution is to govern the relationship between the people and their government, not to control the rights of the people vis–a–vis each other.[17]

▪ Consistent with the foregoing principles, it is, always has been, and remains basic constitutional doctrine that both the federal and state bills of rights, of which the right of free speech is a part, were adopted *to protect individuals against actions of the state.*[18] As one respected legal authority succinctly explains:

The guaranties found in the state and federal constitutions which are intended for the protection of the individual in his person, his liberty, and his property have not been the result of any theorizing as to what ought to be secured to the individual by way of enjoyment; they have been the result of experience, and they relate to the supposed respects in which it has been found necessary to limit the powers of government in order that the largest practicable measure of individual freedom and

---

[16]*See also* H. Black, at 2; 16 Am. Jur. 2d *Constitutional Law* §§ 6, 7 (1964).

[17]*See* Dolliver, *The Washington Constitution and "State Action": The View of the Framers,* 22 Willamette L. Rev. 445, 448 (1986). We recognize, of course, that state constitutions can and do contain provisions that concern the rights of the people vis–a–vis each other. *See* Const. art. 1, § 16 (eminent domain). Nonetheless, it is equally clear to us that such provisions are exceptions to the rule only, not the rule itself.

[18]*E.g.,* H. Rottschaefer, *American Constitutional Law* § 305, at 724 (1939); H. Black, at 10; E. McClain, *Constitutional Law in the United States* § 205, at 293 (2d ed. 1910).

opportunity may be secured. *Nearly all of them may be traced more or less directly to struggles on the part of the people against the unjust exercise of powers of government in England and in this country.*

(Italics ours.) E. McClain, *Constitutional Law in the United States* § 205, at 292–93 (2d ed. 1910). We deem it very significant that this was accepted constitutional doctrine at the time of the Washington Constitutional Convention in 1889.[19] Moreover, 22 of the 75 delegates to that constitutional convention were practicing lawyers who were undoubtedly familiar with basic constitutional doctrine of the time.[20]

▉ The notion that the free speech provision of the state constitution creates a right that can be wielded by one private individual against another constitutes nothing short of a radical departure from this well understood and accepted constitutional doctrine.[21] The NDPC, nonetheless, argues that if one reads the text of this provision in the manner that they urge us to do, it demonstrates that such a departure was in fact intended by the framers of the state constitution. We do not agree. The free speech clause of our state constitution provides:

> Every person may freely speak, write and publish on all subjects, being responsible for the abuse of that right.

Const. art. 1, § 5. Thus, it is true that the state free speech provision contains no express reference to "state action". This contrasts somewhat with its federal counterpart,

[19]*See* T. Cooley, *Constitutional Law* 22, 200 (1st ed. 1880); J. Jameson, *Constitutional Conventions* 92 (4th ed. 1887); J. Pomeroy, *Constitutional Law* § 230 (10th rev. ed. 1888); 1 J. Hare, *American Constitutional Law* 507–08 (1889).

[20]B. Rosenow, *Journal of the Washington State Constitutional Convention, 1889,* at 465–90 (1962). *See also* A. Mires, *Remarks on the Constitution of the State of Washington,* 22 Wash. Hist. Q. 276, 280, 284–85 (1931); J. Kinnear, *Notes on the Constitutional Convention,* 4 Wash. Hist. Q. 276, 279 (1913).

[21]*See United States v. Guest,* 383 U.S. 745, 771, 16 L. Ed. 2d 239, 86 S. Ct. 1170 (1966) (Harlan, J., concurring in part, dissenting in part) ("the Bill of Rights, designed to protect personal liberties, was directed at rights against governmental authority, not other individuals").

which states that: "*Congress shall make no law . . .* abridging the freedom of speech, . . ." (Italics ours.) U.S. Const. amend. 1. There are contemporaneous newspaper articles indicating that early drafts of the state free speech provision considered by members of the Preamble and Bill of Rights Committee of the state constitutional convention contained reference to "state action" comparable to that contained in the federal constitution.[22]

It is a 2–foot leap across a 10–foot ditch, however, to seize upon the absence of a reference to the State as the actor limited by the state free speech provision and conclude therefrom that the framers of our state constitution intended to create a bold new right that conflicts with the fundamental premise on which the entire constitution is based. To do so would not be to "interpret" our constitution, but to deny its very nature.

The much more likely and reasonable explanation for the absence of the words in question is that the framers viewed them as redundant and in the interest of simplicity simply deleted them. The framers may well also have wished to avoid limiting the prohibitions of the constitutional free speech provision to just the legislative branch of government. In this connection, language comparable to the "Congress shall make no law" statement contained in the federal constitution could reasonably have been perceived as not being sufficiently broad to also include actions of the executive branch. The fundamental nature of our constitution being as it is, either of these two explanations has greater plausibility than the radical view urged upon us by the NDPC.

---

[22]*See* Utter, *The Right To Speak, Write, and Publish Freely: State Constitutional Protection Against Private Abridgment,* 8 U. Puget Sound L. Rev. 157, 172–77 (1984–1985).

We conclude, therefore, that although an express reference to "state action" is absent from the free speech provision of our state constitution, a "state action" limitation is implicit therein.[23]

■ Furthermore, and much more importantly, the question of whether the state free speech provision requires "state action" also directly implicates the separation of powers doctrine.[24] In our recent decision in *Washington State Motorcycle Dealers Ass'n v. State*, 111 Wn.2d 667, 674, 763 P.2d 442 (1988), we emphasized that this doctrine is *a cardinal and fundamental principle* of the entire American constitutional system. As we there observed,

". . . the division of governmental powers into executive, legislative, and judicial represents probably the most important principle of government declaring and guaranteeing the liberties of the people, and preventing the exercise of autocratic power, and that it is a matter of fundamental necessity, and is essential to the maintenance of a republican form of government."

*Motorcycle Dealers*, at 674–75 (quoting 16 Am. Jur. 2d *Constitutional Law* § 296, at 808 (1979)). And as we also firmly cautioned:

"American courts are constantly wary not to trench upon the prerogatives of other departments of government or to arrogate to themselves any undue powers, lest they disturb the balance of power; . . ."

*Motorcycle Dealers*, at 675 (quoting 16 Am. Jur. 2d § 309, at 829–30).

The NDPC maintains that we should adopt a "balancing test" under which we would weigh the free speech interests of the NDPC against the private property interests of the

---

[23]*Cf. MacLean v. First Northwest Indus. of Am., Inc.*, 96 Wn.2d 338, 347, 635 P.2d 683 (1981) ("state action" required for state equal rights amendment); *Borg–Warner Acceptance Corp. v. Scott*, 86 Wn.2d 276, 278, 543 P.2d 638 (1975) ("state action" required under state due process provision); *State v. Ludvik*, 40 Wn. App. 257, 262, 698 P.2d 1064 (1985) ("state action" required for state search and seizure provision).

[24]L. Tribe, *American Constitutional Law* § 18–2, at 1691 (2d ed. 1988).

mall owner. Were we to assume the role of weighing competing constitutional interests asserted between private parties, as the NDPC urges, we would be violating the separation of powers principles just enunciated by arrogating to the judicial branch of government powers that properly reside with the legislative branch of government. As the Supreme Court of Connecticut aptly observed in the face of a like invitation in a similar case:

> It is not the role of this court to strike precise balances among the fluctuating interests of competing private groups which then become rigidified in the granite of constitutional adjudication. That function has traditionally been performed by the legislature, which has far greater competence and flexibility to deal with the myriad complications which may arise from the exercise of constitutional rights by some in diminution of those of others. . . . *Statutes would become largely obsolete if courts in every instance of the assertion of conflicting constitutional rights should presume to carve out in the immutable form of constitutional adjudication the precise configuration needed to reconcile the conflict.*

(Italics ours.) *Cologne v. Westfarms Assocs.*, 192 Conn. 48, 65, 469 A.2d 1201 (1984).[25] Furthermore, were we to so usurp the power and authority of the Legislature in this fashion, we would also be encroaching upon the power and authority of the executive branch by bypassing not only the Governor's prerogative to propose legislation, but also the Governor's constitutional power to veto legislative enactments. We decline to do this.

It is significant that the position we adopt herein commands the support of the overwhelming majority of courts that have addressed this issue. The highest courts of Connecticut, Michigan, New York, North Carolina, Pennsylvania and Wisconsin have all recently concluded in cases involving similar facts that the free speech provisions of their respective state constitutions do not protect against

---

[25] *See also Alderwood Assocs. v. Washington Envtl. Coun.*, 96 Wn.2d 230, 250–51, 635 P.2d 108 (1981) (Dolliver, J., concurring).

infringement by private individuals.[26] It appears that only the California and New Jersey courts have gone so far as to discover such a right in their state constitutions.[27]

Our decision on the "state action" issue in this case is also consistent with the decision of this court in *Alderwood Assocs. v. Washington Envtl. Coun.*, 96 Wn.2d 230, 635 P.2d 108 (1981). In *Alderwood,* the Washington Environmental Council asserted that it had the right to solicit signatures for an initiative at a shopping mall. A 4–member plurality of this court, *i.e., less than a majority of the court,* maintained that there was no "state action" requirement under the free speech and initiative provisions of the state constitution.[28] That plurality then followed what it termed a "balancing approach" for determining when these guaranties prevail over the rights of a private property owner and concluded that the balance tipped in favor of the initiative supporters in that case.[29]

---

[26]*Cologne v. Westfarms Assocs.*, 192 Conn. 48, 469 A.2d 1201 (1984); *Woodland v. Michigan Citizens Lobby,* 423 Mich. 188, 378 N.W.2d 337 (1985), *reh'g denied,* 424 Mich. 1204 (1986); *SHAD Alliance v. Smith Haven Mall,* 66 N.Y.2d 496, 488 N.E.2d 1211, 498 N.Y.S.2d 99 (1985); *State v. Felmet,* 302 N.C. 173, 273 S.E.2d 708 (1981); *Western Pa. Socialist Workers 1982 Campaign v. Connecticut Gen. Life Ins. Co.,* 512 Pa. 23, 515 A.2d 1331 (1986); *Jacobs v. Major,* 139 Wis. 2d 492, 407 N.W.2d 832 (1987). *See also Fiesta Mall Venture v. Mecham Recall Comm.,* 159 Ariz. 371, 767 P.2d 719 (Ct. App. 1988), *review denied* (Feb. 7, 1989); Annot., *Validity, Under State Constitutions, of Private Shopping Center's Prohibition or Regulation of Political, Social, or Religious Expression or Activity,* 38 A.L.R.4th 1219 (1985).

[27]*Robins v. Pruneyard Shopping Ctr.*, 23 Cal. 3d 899, 592 P.2d 341, 153 Cal. Rptr. 854 (1979), *aff'd,* 447 U.S. 74 (1980); *State v. Schmid,* 84 N.J. 535, 423 A.2d 615 (1980), *appeal dismissed,* 455 U.S. 100 (1982). *See also Batchelder v. Allied Stores Int'l, Inc.,* 388 Mass. 83, 445 N.E.2d 590 (1983) (right to solicit signatures at mall under elections provision of state constitution); *Lloyd Corp. v. Whiffen,* 307 Or. 674, 773 P.2d 1294 (1989) (injunction against soliciting signatures for initiative at shopping mall lifted on nonconstitutional grounds).

[28]*Alderwood,* at 243.

[29]*Alderwood,* at 243–46.

Although a fifth member of the court, Justice Dolliver, concurred "with the result", he sharply rejected the plurality's reasoning, branding its free speech analysis "constitution–making by the judiciary of the most egregious sort." *Alderwood*, at 248 (Dolliver, J., concurring). The concurrence nonetheless reasoned that the activity of soliciting signatures for an initiative was authorized by the initiative provision of the state constitution (Const. art. 2, § 1(a) (amend. 72)) and the initiative and referendum statute (RCW 29.79).[30] As the concurring opinion pointed out, unlike the free speech provision, the initiative provision is not part of our state constitution's Declaration of Rights and does not establish a right against the government but declares that the people are part of the legislative process.[31]

The remaining four members of the court in *Alderwood* dissented.[32] The dissent agreed with the objection of the concurrence to the plurality's free speech analysis, though it disagreed with the analysis of the concurrence concerning the initiative provision of the state constitution.[33]

Thus, in *Alderwood, a 5–member majority of this court rejected the argument now posited by the NDPC* that the free speech provision of our state constitution does not require "state action". As a consequence, the holding in *Alderwood* was simply that people have a right under the initiative provision of the Constitution of the State of Washington to solicit signatures for an initiative in a manner that does not violate or unreasonably restrict the rights

---

[30] *Alderwood*, at 251 (Dolliver, J., concurring).

[31] *See Alderwood*, at 253 (Dolliver, J., concurring).

[32] *Alderwood*, at 253 (Stafford, J., dissenting).

[33] *Alderwood*, at 253 (Stafford, J., dissenting).

of private property owners.[34] We expressly do not here disturb that holding.[35]

We also note that we are indeed familiar with the recent writings of some legal commentators which present an array of theoretical arguments as to why they think that constitutional guaranties of individual liberties should not be limited to protecting against actions of the state.[36] We are also mindful, however, as we recently and unanimously declared, that

> [r]ecourse to our state constitution as an independent source for recognizing and protecting the individual rights of our citizens must spring not from pure intuition, but from a process that is at once articulable, reasonable and reasoned.

*State v. Gunwall,* 106 Wn.2d 54, 63, 720 P.2d 808 (1986).[37] Thus, this court is not at liberty to disregard the fundamental nature of our constitution in order to advance theories that may be perceived by some to constitute desirable

---

[34]*See Alderwood,* at 253 (Dolliver, J., concurring). No reason has been suggested why the holding in *Alderwood* would not apply to referendums of the people as well as to initiatives. *See* Const. art. 2, § 1; RCW 29.79 (both referring to initiatives *and* referendums).

[35]The Court of Appeals decision in *Sutherland v. Southcenter Shopping Ctr., Inc.,* 3 Wn. App. 833, 478 P.2d 792 (1970), *review denied,* 79 Wn.2d 1005 (1971), also addressed the question of whether initiative supporters had a constitutional right to solicit signatures at a shopping mall. The Court of Appeals there concluded that the initiative supporters did have such a right. Its decision was based on various grounds, including the free speech provision of the Washington Constitution. *Sutherland,* at 835. To the extent that the decision in *Sutherland* is inconsistent with our decision herein, it is necessarily hereby overruled.

[36]*See, e.g.,* Chemerinsky, *Rethinking State Action,* 80 Nw. U.L. Rev. 503 (1985); Skover, *The Washington Constitutional "State Action" Doctrine: A Fundamental Right to State Action,* 8 U. Puget Sound L. Rev. 221 (1984–1986).

[37]In *State v. Gunwall,* 106 Wn.2d 54, 61–62, 720 P.2d 808 (1986), we set forth several nonexclusive neutral criteria to assist us in determining when recourse to our state constitution is appropriate. Although it has not been necessary in this opinion to explicitly enumerate the *Gunwall* criteria, as such, we have carefully considered same and our analysis herein reflects consideration of the relevant *Gunwall* criteria.

social policy.[38] Significantly, as the United States Supreme Court has recently and clearly declared, *"[w]hether [the "state action" requirement] is good or bad policy, it is a fundamental fact of our political order."* (Italics ours.) *Lugar v. Edmondson Oil Co.,* 457 U.S. 922, 937, 73 L. Ed. 2d 482, 102 S. Ct. 2744 (1982).

Furthermore, as we perceive it, compelling policy reasons exist in support of a "state action" requirement. As Professor Tribe expresses it,

> by exempting private action from the reach of the Constitution's prohibitions, it stops the Constitution short of preempting individual liberty—of denying to individuals the freedom to make certain choices, . . . Such freedom is basic under any conception of liberty, but it would be lost if individuals had to conform their conduct to the Constitution's demands.

L. Tribe, *American Constitutional Law* § 18–2, at 1691 (2d ed. 1988).[39]

■ Accordingly, we hold that the free speech provision of our state constitution protects an individual only against actions of the State; it does not protect against actions of other private individuals. The NDPC thus has no right under Const. art. 1, § 5 to solicit contributions and sell literature at the mall.

The NDPC proceeds, however, to make the additional argument that our state constitution's free speech provision applies to shopping malls under the "public function" doctrine.

---

[38]*See* Deukmejian & Thompson, *All Sail and No Anchor—Judicial Review Under the California Constitution,* 6 Hastings Const. L.Q. 975 (1979); Berger, *"The Supreme Court as a Legislature": A Dissent,* 64 Cornell L. Rev. 988 (1978–1979).

[39]*See also Stephanus v. Anderson,* 26 Wn. App. 326, 340–41, 613 P.2d 533, *review denied,* 94 Wn.2d 1014 (1980); Marshall, *Diluting Constitutional Rights: Rethinking "Rethinking State Action",* 80 Nw. U.L. Rev. 558 (1985).

■ The "public function" doctrine is a means of satisfying the "state action" requirement.[40] It provides:

> The state cannot free itself from the limitations of the Constitution in the operation of its governmental functions merely by delegating certain functions to otherwise private individuals. If private actors assume the role of the state by engaging in these governmental functions then they subject themselves to the same limitations on their freedom of action as would be imposed upon the state itself.

2 R. Rotunda, J. Nowak & J. Young, *Constitutional Law* § 16.2, at 163 (1986). A "public function" is one that is "traditionally exclusively reserved to the State." *Jackson v. Metropolitan Edison Co.,* 419 U.S. 345, 352, 42 L. Ed. 2d 477, 95 S. Ct. 449 (1974).[41]

The "public function" doctrine was applied by the United States Supreme Court in the well–known case of *Marsh v. Alabama,* 326 U.S. 501, 90 L. Ed. 265, 66 S. Ct. 276 (1946). *Marsh* involved the question of whether the management of a privately owned company town could prohibit a Jehovah's Witness from distributing religious literature in the town. The Court held that it could not, reasoning that the private entity which owned the town was subject to the strictures of the First Amendment because it was performing a "public function".[42]

In the more recent case of *Lloyd Corp. v. Tanner,* 407 U.S. 551, 33 L. Ed. 2d 131, 92 S. Ct. 2219 (1972), however, the United States Supreme Court expressly declined to extend the "public function" doctrine to a privately owned shopping mall. It had been argued in *Lloyd* that since a shopping center has sidewalks, streets, and parking areas

---

[40]*See Marsh v. Alabama,* 326 U.S. 501, 90 L. Ed. 265, 66 S. Ct. 276 (1946); 2 R. Rotunda, J. Nowak & J. Young, *Constitutional Law* § 16.2, at 163 (1986).

[41]*See also Flagg Bros., Inc. v. Brooks,* 436 U.S. 149, 157–58, 56 L. Ed. 2d 185, 98 S. Ct. 1729 (1978).

[42]*See Marsh,* 326 U.S. at 506–08.

which are functionally similar to those provided by municipalities, the public should have the same right of free speech there as in the streets of a city or town.[43] The United States Supreme Court rejected this contention, declaring:

> The argument reaches too far. The Constitution by no means requires such an attenuated doctrine of dedication of private property to public use. The closest decision in theory, *Marsh* v. *Alabama,* [326 U.S. 501, 90 L. Ed. 265, 66 S. Ct. 276 (1946)], involved the assumption by a private enterprise of all of the attributes of a state–created municipality and the exercise by that enterprise of semi–official municipal functions as a delegate of the State. In effect, *the owner of the company town was performing the full spectrum of municipal powers and stood in the shoes of the State. In the instant case there is no comparable assumption or exercise of municipal functions or power.*

(Footnote omitted. Italics ours.) *Lloyd,* 407 U.S. at 569.

Based on *Lloyd,* therefore, it is obvious in the case before us that the "public function" doctrine is inapposite under the Constitution of the United States. Nor do we perceive any persuasive reason why this doctrine should apply any differently under our state constitution. It simply cannot reasonably be said that a shopping mall performs the functions traditionally and exclusively reserved to the state. A shopping mall is not a town and malls do not provide all essential public services such as water, sewers, roads and sanitation; nor do they accept responsibility for such functions as education or public safety.[44] Rather, shopping malls are concerned with just one aspect of their patrons' lives—shopping.[45] The mere fact that shopping malls, like any large department store, have rest rooms for the convenience of their patrons, and security personnel to prevent

---

[43]*Lloyd Corp. v. Tanner,* 407 U.S. 551, 569, 33 L. Ed. 2d 131, 92 S. Ct. 2219 (1972).

[44]*Western Pa. Socialist Workers 1982 Campaign v. Connecticut Gen. Life Ins. Co.,* 512 Pa. 23, 36, 515 A.2d 1331 (1986).

[45]*Jacobs v. Major,* 139 Wis. 2d 492, 523, 407 N.W.2d 832 (1987).

shoplifting, cannot by any stretch of the imagination translate into "the full spectrum of municipal powers".[46]

We further agree with the United States Supreme Court in *Lloyd* that "property [does not] lose its private character merely because the public is generally invited to use it for designated purposes", and that "[t]he essentially private character of a store and its privately owned abutting property does not change by virtue of being large or clustered with other stores in a modern shopping center." *Lloyd*, 407 U.S. at 569. Moreover, if public invitation and size were the relevant criteria, it could well be asked how shopping centers could be legally distinguished from places such as sport stadiums, convention halls, theaters, county and state fairs, large office and apartment buildings, supermarkets, department stores or churches.[47]

We thus hold, in addition to our earlier conclusion that the state constitution's free speech provision does not protect individuals from actions of other private individuals, that the "public function" doctrine is inapplicable here.

ISSUE THREE.

CONCLUSION. The mall manager's statement that an NDPC member wore a "swastika–type symbol" is privileged because it was made in the course of a judicial proceeding and pertained to the relief sought. The trial court correctly granted summary judgment in favor of Southcenter on the NDPC's counterclaim for defamation.

The NDPC argues that the Superior Court erred in granting summary judgment against it on its defamation counterclaim. The NDPC alleges it was defamed by a statement contained in an affidavit submitted by the mall manager that he observed an NDPC member wearing a

---

[46]*Lloyd*, 407 U.S. at 569.

[47]*See Cologne v. Westfarms Assocs.*, 192 Conn. 48, 64, 469 A.2d 1201 (1984); *Woodland v. Michigan Citizens Lobby*, 423 Mich. 188, 225, 378 N.W.2d 337 (1985), *reh'g denied*, 424 Mich. 1204 (1986).

"swastika–type symbol". Southcenter maintains this statement is privileged as relevant to court proceedings.

 In *McNeal v. Allen,* 95 Wn.2d 265, 621 P.2d 1285 (1980), this court set forth the applicable rule:

> Allegedly libelous statements, spoken or written by a party or counsel in the course of a judicial proceeding, are absolutely privileged if they are pertinent or material to the redress or relief sought, whether or not the statements are legally sufficient to obtain that relief.

*McNeal,* at 267. The statement at issue in this case was made in the course of a judicial proceeding; it was contained in an affidavit filed in support of Southcenter's motion for a preliminary injunction. The statement also pertained to the relief sought. Southcenter maintained that the NDPC's use of the mall was in violation of its rules and unduly interfered with the business environment within the mall. Southcenter, therefore, sought to enjoin the NDPC from using its premises. The statement that one of the NDPC people was wearing a "swastika–type symbol" is pertinent to that claim for relief. Thus, the statement was privileged and the trial court correctly granted summary judgment in favor of Southcenter on the NDPC's defamation counterclaim.

We affirm the Superior Court's order granting Southcenter's motion for summary judgment.

CALLOW, C.J., and BRACHTENBACH, DOLLIVER, DURHAM, and SMITH, JJ., concur.

UTTER, J. (concurring in the result)—I agree with the majority that, given the facts of this case, Const. art. 1, § 5 (hereinafter section 5) does not allow the petitioners the right to solicit donations and memberships within a private shopping mall. The majority's rationale for reaching this result, however, is one with which I cannot agree.

In applying the interpretive criteria we developed in *State v. Gunwall,* 106 Wn.2d 54, 720 P.2d 808 (1986),[48] I find a different basis for our common result. There simply is no compelling reason why we should append a state action requirement to section 5 when the plain language and drafting history of the provision suggest otherwise. Worse, the majority fails to address arguments that the state action doctrine is generally inappropriate at the state level. It also does not articulate what form of state action test it means to apply to situations such as the case presented; in so doing, it ignores the possibility of state action in today's case and leaves trial courts, which must frequently apply our rules, without guidance. The majority also fails to discuss the fact that for 8 years the courts of our state—including the court below—have successfully used the balancing test developed in *Alderwood Assocs. v. Washington Envtl. Coun.,* 96 Wn.2d 230, 635 P.2d 108 (1981). The rulings of these courts indicate that *Alderwood* functions as a more coherent limiting principle than the ill-defined state action doctrine. Such a balancing approach is mandated by *Pruneyard Shopping Ctr. v. Robins,* 447 U.S. 74, 83–87, 64 L. Ed. 2d 741, 100 S. Ct. 2035 (1980), in cases where a state seeks to enforce a state constitutional speech right. The majority leaves undisturbed the result in *Alderwood* which recognizes the State's duty to enforce an individual's right to petition on certain private property. *See Alderwood,* 96 Wn.2d at 251–53 (Dolliver, J., concurring). Thus, this court must use a balancing approach when analyzing that manifestation of the right to speech; we do not give an adequate rationale why balancing should not be used in the speech issue presented today. Further, in abandoning the *Alderwood* test, the majority also leaves without a principled underpinning the possibility of enforcing speech rights against other types of private infringements—

---

[48]The majority claims, in footnote 37, that its analysis "reflects consideration of the relevant *Gunwall* criteria." Nonetheless, the opinion makes no overt reference to that case's interpretive criteria and their interaction with section 5.

such as actions by political parties, private universities, labor unions, private clubs, and civic organizations. These are common problems in our complex society. For these reasons, I concur with the majority in result only.

# I

Analysis of this case following the nonexclusive criteria developed in *State v. Gunwall, supra,* shows that the state action doctrine is incongruent with much of the state constitution in general and with section 5 in particular. The first two *Gunwall* criteria involve the text of the state constitutional provision. These two criteria encourage analysis of the language of the provision itself as well as textual contrasts with its federal parallel. *Gunwall,* 106 Wn.2d at 61.

The majority does undertake a brief analysis of section 5's language. As the majority must acknowledge, the text makes no reference to governmental actions. The provision states simply: "Every person may freely speak, write and publish on all subjects, being responsible for the abuse of that right." The unambiguous nature of these words stands as a major obstacle to any attempt to read a state action requirement into them. If constitutional provisions are textually clear, this court will give the words their plain meaning. *See Anderson v. Chapman,* 86 Wn.2d 189, 191, 543 P.2d 229 (1975). Such a plain meaning here could not include a state action requirement—the language simply is not present in section 5.

Moreover, as the majority also acknowledges, the committee that drafted the speech provision specifically deleted state action language from its finished product. The first version of section 5 read: "*That no law shall be passed* restraining the free expression of opinion or restricting the right to speak, write or print freely on any subject." (Italics mine.) Tacoma Daily Ledger, July 13, 1889, at 4, col. 3; *see also* Utter, *The Right To Speak, Write, and Publish Freely: State Constitutional Protection Against Private Abridgment,* 8 U. Puget Sound L. Rev. 157, 172 (1985)

(hereinafter *Right To Speak*). After a number of revisions, the Preamble and Declaration of Rights Committee submitted the text of the speech provision minus the state action language to the convention for passage. This version was based in part on the speech guaranty of the California constitution.[49] *Right To Speak,* at 175–77. The convention passed this version of section 5 without debate.

The most logical and direct conclusion one can draw from this history is that the committee members considered the impact of the state action language and decided against it. One must assume that they were aware of United States Supreme Court cases on state action, notably the seminal *Civil Rights Cases,* 109 U.S. 3, 27 L. Ed. 835, 3 S. Ct. 18 (1883), decided just a few years before the convention. Likewise, the committee members must have been familiar with Justice Harlan's dissent in that case: he argued that the Fourteenth Amendment would allow Congress to regulate private behavior that discriminated against non-whites.[50] *Civil Rights Cases, supra* at 27 (Harlan, J., dissenting). This example, as well as the state actionless Thirteenth Amendment,[51] demonstrated to the Washington

---

[49]The California Supreme Court has construed its constitution's free speech provision to apply to private infringements of the right. *Robins v. Pruneyard Shopping Ctr.,* 23 Cal. 3d 899, 592 P.2d 341, 153 Cal. Rptr. 854 (1979), *aff'd,* 447 U.S. 74, 64 L. Ed. 2d 741, 100 S. Ct. 2035 (1980).

[50]Justice Harlan stressed that section 1 of the Fourteenth Amendment granted state as well as United States citizenship to "'[a]ll persons born or naturalized in the United States . . .'" *Civil Rights Cases,* 109 U.S. at 46. The fifth section of the amendment, he noted, gave Congress the power to enforce "the provisions of this article." Because of this, he found that the amendment authorized Congress to safeguard the privileges and immunities that flowed from state citizenship. Justice Harlan found the essence of these privileges and immunities to be "exemption from race discrimination in respect of any civil right belonging to citizens of the white race in the same State." *Civil Rights Cases, supra* at 48. *See also* L. Tribe, *American Constitutional Law* 1695 n.16 (2d ed. 1988).

[51]The Thirteenth Amendment, ratified in 1865, states:
[Section 1.] Neither slavery nor involuntary servitude, except as a punishment for crime whereof the party shall have been duly convicted, shall exist within the United States, or any place subject to their jurisdiction.

Constitution's framers that even the federal constitution, when aiming to secure personal liberties, could directly regulate the actions of private individuals.[52]

The deliberateness of omitting the state action language becomes even more apparent when one compares the language of section 5 with other provisions in Washington's Declaration of Rights. Many of these other provisions contain an express state action requirement. For example, Const. art. 1, § 12 provides:

> *No law shall be passed* granting to any citizen, class of citizens, or corporation other than municipal, privileges or immunities which upon the same terms shall not equally belong to all citizens, or corporations.

(Italics mine.) *See also* Const. art. 1, §§ 8, 11, 23, 28. One can only assume that the inclusion of state action language in some provisions and its omission in others was intentional. Without direct evidence to the contrary, one must conclude that the framers did not wish state action to be a requirement for the free speech provision's operation.

The preamble to the state constitution, when read in conjunction with the Declaration of Rights, provides further evidence that state action was not intended. The preamble states:

> We, the people of the State of Washington, grateful to the Supreme Ruler of the Universe for our liberties, do ordain this constitution.

The language of the preamble demonstrates that the framers were not positivists: they did not see the constitution itself as the source of the rights contained within it. Rather, the "liberties" came from a higher source. The

---

[Section 2.] Congress shall have power to enforce this article by appropriate legislation.

In the *Civil Rights Cases, supra,* the Supreme Court held this plain language was "not a mere prohibition of State laws . . . but an absolute declaration . . ." Thus, no state action was required. 109 U.S. at 20.

[52]Moreover, in light of the impact of the *Civil Rights Cases, supra,* the majority's guess that the deletion of state action language was done merely because the framers thought it redundant appears all the more unlikely. See majority, at 424.

framers, then, subscribed to theories of natural law and inherent rights similar to those that inspired the Declaration of Independence and the Bill of Rights in the federal constitution. *See* L. Tribe, *American Constitutional Law* 1309 (2d ed. 1988) (hereinafter Tribe); Corwin, *The "Higher Law" Background of American Constitutional Law,* 42 Harv. L. Rev. 149 (1928–1929).

According to contemporary evidence, the reference to God or Supreme Ruler was a great point of controversy at the convention. *See* Portland Morning Oregonian, July 30, 1889; Tacoma Daily Ledger, July 30, 1889, at 4. When first presented by the committee, the preamble read: "We, the people of the state of Washington, to preserve our rights, do ordain this constitution." Debate ensued and the delegates introduced various alternative versions of the preamble. The convention eventually compromised and adopted the reference to the "Supreme Ruler." Portland Morning Oregonian, July 30, 1889.

Both versions of the preamble quoted above imply that the rights inhere in the citizenry rather than emanate from the State. This point, then, was not controversial. Consequently, listing the rights in the constitution could only have been meant to protect them. This protective function is further implied by the title of "Declaration" rather than "Bill" of rights: the document does not confer rights, it declares those that naturally exist. *See* Wiggins, *Francis Henry and the Declaration of Rights,* Washington State Bar News 54 (May 1989).

The natural law tone of the constitution is strengthened by Const. art. 1, § 32. This section declares: "A frequent recurrence to fundamental principles is essential to the security of individual right and the perpetuity of free government." The notion of fundamental principles was central to natural law theories at the time. *See* Tribe, at 560. That the principles are not spelled out further indicates that the framers looked to other, nongovernmental sources for the origin of the rights listed in the constitution. If these rights are fundamental and naturally occurring, then

it is incongruous to maintain that they are good only against the government. *See* Chemerinsky, *Rethinking State Action,* 80 Nw. U.L. Rev. 503, 527–31 (1985).

The majority concludes, however, that the omission of "state action" language in section 5 served another purpose. It posits a "much more likely and reasonable explanation." First, the majority surmises that the framers thought the state action language redundant. Second, it hypothesizes that the framers sought to protect freedom of speech from assaults by all branches of government rather than simply the Legislature, as might be implied by the First Amendment's reference to "Congress shall make no law". Majority, at 424. Given the fact that the majority cites no authority for either prong of this "explanation," one must accept it for what it is: mere conjecture.

First, from a purely linguistic point of view, removing from section 5 language referring specifically to acts of state has great effect. Quite simply, it changes the facial meaning of the provision to state it in the absolute rather than in terms of state action. As mentioned previously, in light of contemporary United States Supreme Court precedent, we must assume that the framers knew what they were doing.

Although the majority cites no authority for its second "explanation," a "Congress–only" interpretation of the First Amendment might be inferred in *State v. Haffer,* 94 Wash. 136, 162 P. 45 (1916). In that case, this court referred to the First Amendment as applying to acts of Congress only. *Haffer,* at 143. On closer inspection, however, the reference to Congress appears to relate to the federal government as a whole. We stated: "[I]t is a settled rule of construction that the limitations [the federal constitution] imposes upon the power of government are in all cases to be understood as limitations upon the government of the Union only, except where the states are expressly mentioned." *Haffer,* at 143, quoting T. Cooley, *Constitutional Limitations* 46 (7th ed. 1903). Thus, the case simply stands for the then–correct proposition that the First

Amendment applied to the federal government and section 5 applied to speech issues within the state.

Moreover, free speech jurisprudence in state courts contemporaneous with Washington's constitutional convention focused primarily on a municipality's ability to employ the police power to regulate public gatherings. *See, e.g., Anderson v. Wellington,* 40 Kan. 173, 19 P. 719 (1888) (peaceful parades lawful without permit); *Commonwealth v. Davis,* 140 Mass. 485, 4 N.E. 577 (1886) (likened city's interest in public forum to that of private property owner, therefore able to regulate at will), *aff'd,* 162 Mass. 510, 39 N.E. 113 (1895), *aff'd,* 167 U.S. 43 (1897); *In re Frazee,* 63 Mich. 396, 30 N.W. 72 (1886) (upholding right to parade peaceably with or without permit); *see generally* Anderson, *The Formative Period of First Amendment Theory, 1870–1915,* 24 Am. J. Legal Hist. 56 (1980).[53] At the municipal level, the legislative and executive functions are often blurred. Consequently, a "Legislature–only" approach to state free speech jurisprudence was not clearly established in the 1880's. As a result, there is no basis for reading the majority's second "explanation" into the plain language of section 5.

Further, the second "explanation" also leans toward being overly positivist. In light of the language of the preamble, the conscious omission of state action language in many sections and its inclusion in others, and the call to look to "fundamental principles" to secure individual rights, it is more likely that the framers had broader visions in mind.

## II

Aside from the specific language of section 5, reasons inherent to the structure of our state constitution argue

---

[53]Many of our own early cases involving speech rights never analyzed the constitutional issues. *See State v. Hestings,* 115 Wash. 19, 196 P. 13 (1921); *State v. Aspelin,* 118 Wash. 331, 203 P. 964 (1922) (both criminal prosecutions of members of the Industrial Workers of the World under the Criminal Syndicalism Act).

against a generalized state action requirement in state constitutional jurisprudence. The majority cursorily dismisses commentary developing these reasons as "an array of theoretical arguments"[54] and declares that constitutional analysis "must spring not from pure intuition, but from a process that is at once articulable, reasonable and reasoned." Majority, at 429, quoting *State v. Gunwall,* 106 Wn.2d at 63. Ironically, these dismissed reasons relate directly to the fifth criterion we announced in *Gunwall*: "*[d]ifferences in structure between the federal and state constitutions.*" *Gunwall,* at 62.

One cannot overlook the fact that the state action doctrine was developed around the text of and policies behind the fourteenth amendment to the federal constitution—not the constitution of any individual state. The Fourteenth Amendment is drafted around a scheme specifically aimed at the actions of states:

> *No state shall make or enforce any law* which shall abridge the privileges or immunities of citizens of the United States; *nor shall any state* deprive any person of life, liberty, or property, without due process of law; nor deny to any person within *its* jurisdiction the equal protection of the laws.

(Italics mine.) As mentioned above, the United States Supreme Court formally developed the state action requirement for cases involving federal legislation based on the Fourteenth Amendment in the *Civil Rights Cases, supra.*

The marked contrast between the state and federal texts is, once again, one of the more obvious reasons why "state action" should not be required when interpreting a state

---

[54]In this area of state constitutional interpretation, where records of the delegates' debates and committee members' discussions are scanty, reasoned theoretical discussion—supported by legal and historical authority—is essential to our task. In this regard, even the majority's position is no more than a "theoretical argument." Status as such an argument, however, is not necessarily belittling, as the majority would acknowledge in its own argument's case. What is essential is, as the majority tells us, "a process that is at once articulable, reasonable and reasoned"—in other words, a fair examination of ideas, authority, and evidence. The majority fails to do this.

constitution. At a deeper level, however, these textual differences highlight interests of federalism essential to the application of the federal constitution but irrelevant to state constitutional jurisprudence.

In our scheme of federal government, an individual state, because it remains a sovereign, retains plenary power. This power is limited only by the state's own constitution, the federal constitution, and federal laws and treaties. *See* U.S. Const. art. 6, cl. 2. Accordingly, the state has direct power to regulate, within these limits, the behavior of private individuals within its own borders. The federal government, on the other hand, enjoys only those powers granted to it in the federal constitution. Therefore, the power of the federal government to regulate private behavior is theoretically less than that of the individual states. Although in recent decades Congress's ability to regulate private activity has expanded,[55] at the time Washington's constitution was drafted, such ability was restricted. *See, e.g., Civil Rights Cases, supra; United States v. Harris,* 106 U.S. 629, 27 L. Ed. 290, 1 S. Ct. 601 (1882) (criminal provision under Civil Rights Act unconstitutional as it attempts to proscribe private rather than state action and therefore beyond the power of Congress); *United States v. Cruikshank,* 92 U.S. 542, 23 L. Ed. 588 (1875). Relevant federal constitutional opinions at that time often emphasized the Tenth Amendment, outlining spheres of state vis–a–vis federal regulating ability. This approach became known as the "dual sovereignty" doctrine. *See generally* 1 R. Rotunda, J. Nowak & J. Young, *Constitutional Law* § 4.6 (1986).

Within this constitutional scheme, the state action doctrine, based on the Fourteenth Amendment's language,

---

[55]The commerce power has been a prime source for the expanding ability of the federal government to regulate private behavior. *See, e.g., Wickard v. Filburn,* 317 U.S. 111, 87 L. Ed. 122, 63 S. Ct. 82 (1942) (upholding marketing quota applied to farmer growing very small amount of wheat for local sale only: affected the "stream of commerce"); *Heart of Atlanta Motel, Inc. v. United States,* 379 U.S. 241, 13 L. Ed. 2d 258, 85 S. Ct. 348 (1964) (upholding Title II of the Civil Rights Act under the commerce power).

provided a brake on federal action which may have intruded on the as–then–perceived sovereignty of the states. Part of this sovereignty was the ability to regulate private behavior—the police power. *See, e.g., Civil Rights Cases, supra* at 13;[56] *see also* Skover, *The Washington Constitutional "State Action" Doctrine: A Fundamental Right to State Action,* 8 U. Puget Sound L. Rev. 221, 250–54 (1985). The political realities in the late 1860's may well have been that any greater attempt by the federal government to enforce its will over other sovereigns would have endangered the amendment's ratification.

The use of the state action doctrine at the state level, however, amounts to an importation of a foreign concept fashioned to suit the needs of federalism. The individual state does not face the problem of enforcing its will over other sovereigns. The state ultimately has total power over the municipalities within its boundaries. *See, e.g., Hunter v. Pittsburgh,* 207 U.S. 161, 52 L. Ed. 151, 28 S. Ct. 40 (1907). The state has use of the police power and may—within state and federal constitutional limits—regulate private behavior as it wishes. In fact, the tone of United States Supreme Court opinions during the genesis of the Fourteenth Amendment state action doctrine assumes that the states will safeguard individual liberties by regulating private activity where the federal government cannot. *See, e.g., Civil Rights Cases, supra* at 13 (implying that only where a state fails to protect persons of their equal rights will Congress have the authority to remedy the situation); *United States v. Cruikshank, supra* at 555 ("That duty [of protecting all citizens in the enjoyment of equal rights] was originally assumed by the States; and it still remains there. The only obligation resting upon the United States is to see

---

[56]The Supreme Court stated: "[Fourteenth Amendment–based] legislation cannot properly cover the whole domain of rights appertaining to life, liberty and property, defining them and providing for their vindication. That would be to establish a code of municipal law regulative of all private rights between man and man in society. It would be to make Congress take the place of the State legislatures and to supersede them. . . ." 109 U.S. at 13.

that the States do not deny the right."). Thus, when the state's Declaration of Rights does not expressly limit itself to protecting those rights against government infringement, there is no reason to graft such a limitation onto it. The scheme of power in the federal system certainly does not compel such a result; if anything, it requires the opposite.

Nonetheless, the majority cites early treatises on constitutional law to support its claim that the state constitution functions only to create and limit the powers of the state government. The Washington Declaration of Rights, the majority argues, guarantees the rights therein from governmental infringement only. Inherent in the concept of a constitution, apparently, the Declaration of Rights can do no more. Earlier expositions of this view have acknowledged that the state has the power to regulate private activity, but that this power is vested in the Legislature, not the courts. *See Alderwood Assocs. v. Washington Envtl. Coun., supra* at 247–53 (Dolliver, J., concurring); *see also* Dolliver, *The Washington Constitution and "State Action": The View of the Framers*, 22 Willamette L. Rev. 445 (1986) (hereinafter Dolliver). One could call this the "inherent state action" approach.

It is true that the framers sought to protect their rights from government infringement. An air of general distrust of government pervaded the state constitutional convention. *See, e.g., Journal of the Washington State Constitutional Convention, 1889,* at vi (B. Rosenow ed. 1962) (hereinafter *Journal*). Despite theories expressed in legal treatises, however, the historical record does not imply that the framers intended to stop at this point. They were in a reform state of mind. In 1889, a wave of populism lapped against the shores of Olympia as the constitution was drafted. A number of "special interest" movements gave the convention, and its product, a legislative flavor: women's suffrage, prohibition of alcohol, and careful regulation of banks and other corporations. Many delegates to the convention feared infringement of their rights from corporate as well as governmental quarters. *See Journal,* at

vi. The constitution today still contains provisions regulating corporations and the liability of officers of banking institutions. *See generally* Const. art. 12; *see also* Const. art. 2, § 33 (generally prohibiting alien ownership of land within the state (repealed in 1966)); Const. art. 1, § 16 ("Private property shall not be taken for private use . . ."). Thus, our constitution often directly regulates private activity.[57]

The majority contends that the *Alderwood* plurality's balancing approach—a tool for applying section 5 to private infringement—violates the separation of powers principle.[58] It claims that this court would violate the principle by "weighing competing constitutional interests asserted between private parties". Majority, at 426. I find this statement incomprehensible. A common function of the judicial system is to weigh competing interests. That disputes may be of constitutional magnitude further emphasizes the importance of the courts' roles in resolving them. Put simply, courts in general and this court in particular often must engage in weighing competing constitutional inter-

---

[57]The majority acknowledges that the constitution does regulate private activity and contains provisions "that concern the rights of the people vis-a-vis each other." Footnote 17. The majority dismisses the impact of these provisions by stating that "it is equally clear to us that such provisions are exceptions to the rule only, not the rule itself." Unfortunately, the majority does not tell us why. It does not submit a principled basis for distinguishing the provisions it recognizes as reaching private activity and section 5. Using the *Gunwall* criteria, I cannot see why section 5—which contains no state action language—should include a hidden state action requirement when the majority's example of Const. art. 1, § 16— which also contains no state action language—should not.

[58]Although the majority, at page 425, attributes the balancing approach to NDPC ("The NDPC maintains that we should adopt a 'balancing test'"), petitioners are simply urging this court to follow the test developed in *Alderwood*. Thus, the majority's comments, while directed at the NDPC, are more properly aimed at our own plurality decision in that case. Moreover, the characterization that we are being urged to "adopt" something new is inaccurate. The *Alderwood* balancing test has been available to trial courts since we announced that opinion in 1981. See part V, *infra*.

ests.[59] *See, e.g., Marsh v. Alabama,* 326 U.S. 501, 90 L. Ed. 265, 66 S. Ct. 276 (1946) (weighing property against speech interests); *Pruneyard Shopping Ctr. v. Robins,* 447 U.S. 74, 88, 64 L. Ed. 2d 741, 100 S. Ct. 2035 (1980) (weighing state constitutional right to speech—and the state's police power to enforce its exercise—against Fourteenth Amendment property and due process rights); *Bering v. Share,* 106 Wn.2d 212, 721 P.2d 918 (1986), *cert. dismissed,* 479 U.S. 1050, 93 L. Ed. 2d 990, 107 S. Ct. 940 (1987) (weighing competing interests in determining validity of time, place and manner restrictions on speech);[60] *Ingram v. Problem Pregnancy of Worcester, Inc.,* 396 Mass. 720, 488 N.E.2d 408 (1986) (balancing property and speech rights); *State v. Brown,* 212 N.J. Super. 61, 513 A.2d 974 (same; no state action required), *cert. denied,* 107 N.J. 53, 526 A.2d 140 (1986).

---

[59]The weighing of competing constitutional interests has been an essential factor in many United States Supreme Court cases grappling with the state action inquiry. Certainly the majority does not contend that the Court has founded this jurisprudence on an unconstitutional principle. See part V, *infra.*

[60]We began the *Bering* opinion with this statement: "No judicial task is more difficult than balancing the constitutional rights and freedoms of citizens of this country against conflicting rights and freedoms of their fellow citizens." 106 Wn.2d at 215. We made no comment on the fact that we might be usurping legislative power.

*Bering* is firmly founded on the principles of time, place, and manner regulation. This area of jurisprudence, even when analyzing the constitutional validity of statutes, inherently involves balancing competing constitutional interests. *See Cox v. Louisiana,* 379 U.S. 536, 554–55, 13 L. Ed. 2d 471, 85 S. Ct. 453 (1965). Surely the majority does not mean to imply that courts which have resolved such cases have done so unconstitutionally. Yet, this conclusion arises unescapably from the majority's reasoning. Accordingly, the majority would have us overrule, among others: *Bering v. Share, supra; State v. Lotze,* 92 Wn.2d 52, 593 P.2d 811 (regulating speech as expressed through privately owned billboard), *appeal dismissed,* 444 U.S. 921 (1979); *Ackerley Communications, Inc. v. Seattle,* 92 Wn.2d 905, 602 P.2d 1177 (1979) (regulating commercial billboards), *cert. denied,* 449 U.S. 804 (1980); *Shively v. Garage Employees Local Union 44,* 6 Wn.2d 560, 569, 108 P.2d 354 (1940) ("we are concerned with balancing appellants' right to carry on lawful businesses, free from unreasonable interference, and respondents' right to freedom of speech").

It is true nonetheless that the police power is vested in the Legislature, not the courts. *See* Dolliver, at 456. The idea, however, that the courts usurp the police power when applying constitutional provisions against private action is inaccurate. Interpreting a constitutional provision is no more a usurpation of power than construing legislation. If the plain language and drafting history of that constitutional provision—as well as compelling conceptual reasons—suggest that the provision should be interpreted a certain way, then the court is simply doing its constitutional duty in doing so. *Cf. Anderson v. Chapman, supra.* Merely because the provision may have far–reaching application is not a basis for arguing that the court is usurping power. The exercise of the police power was done by the framers in drafting the constitutional provision, not by the court in interpreting it.

Moreover, democratic pressures on state courts further legitimize those courts' roles in enforcing state constitutional provisions against private action. The voting public always retains the power to express its voice at the ballot box. Judges with whom the public does not agree can be voted out of office when their terms expire. *See* Const. art. 4, § 3. Such democratic pressure lends implicit approval to state court decisions which may appear to expand constitutional liberties. *See* Utter, *State Constitutional Law, the United States Supreme Court, and Democratic Accountability: Is There a Crocodile in the Bathtub?,* 64 Wash. L. Rev. 19 (1989).

Ultimately, however, the majority's "inherent state action" approach does not address the federalist assumptions behind the original development of state action in Fourteenth Amendment jurisprudence: that states would protect rights against private actors. Further, the approach ignores the relevance of section 5's plain language in light of these assumptions. Although it offers "explanations," the majority's position is that it was mere coincidence that the framers specifically dropped state action language from

section 5 a few short years after the United States Supreme Court developed the state action doctrine. In the era of dual sovereignty, such an omission could not have been so fortuitous.

## III

The majority neither discusses nor acknowledges that many states have abandoned the state action doctrine at the state level in a number of contexts. In *Sharrock v. Dell Buick–Cadillac, Inc.*, 45 N.Y.2d 152, 379 N.E.2d 1169, 408 N.Y.S.2d 39 (1978), the New York Court of Appeals developed a flexible "state involvement" test when applying the state constitution's due process clause to a dispute over a nonjudicial foreclosure sale. The court noted that the plain language of the provision did not refer to state action: "'[n]o person shall be deprived of life, liberty or property without due process of law.'" In contrast to the federal Fourteenth Amendment, the court found that the state constitution had "long safeguarded any threat to individual liberties, irrespective of from what quarter that peril arose." 45 N.Y.2d at 160. *See also Svendsen v. Smith's Moving & Trucking Co.*, 54 N.Y.2d 865, 429 N.E.2d 411, 444 N.Y.S.2d 904 (1981) (holding nonjudicial sale provision of U.C.C. § 7–210 unconstitutional), *cert. denied*, 455 U.S. 927 (1982); *but see Borg–Warner Acceptance Corp. v. Scott*, 86 Wn.2d 276, 543 P.2d 638 (1975) (U.C.C. § 9–503 self–help repossession provision not unconstitutional because no state action involved).

In the criminal search and seizure area, the California Supreme Court has held that intrusive conduct of private security personnel that violated the state constitution was unlawful even though the State was not involved in the search. *People v. Zelinski*, 24 Cal. 3d 357, 594 P.2d 1000, 155 Cal. Rptr. 575 (1979). The court overruled precedent limiting the exclusionary rule to state intrusions. *But see State v. Ludvik*, 40 Wn. App. 257, 262, 698 P.2d 1064 (1985) (constitution protects "only against governmental

actions and do[es] not require the application of the exclusionary rule to evidence obtained from private citizens acting on their own initiative.").

Other courts have considered the need for a state action requirement in applying state constitutions to acts of discrimination by private employers. *See, e.g., Gay Law Students Ass'n v. Pacific Tel. & Tel. Co.,* 24 Cal. 3d 458, 469, 595 P.2d 592, 156 Cal. Rptr. 14 (1979) (applying state equal protection provision to private employer); *Peper v. Princeton Univ. Bd. of Trustees,* 77 N.J. 55, 79–80, 389 A.2d 465 (1978) (same); *but see Schreiner v. McKenzie Tank Lines, Inc.,* 432 So. 2d 567, 569 (Fla. 1983) (restricting application of state constitution's inalienable rights and deprivation clauses to state action).

In the free speech context, a number of states have applied their constitutions to mend private infringements, although many states have not been willing to do so in cases involving shopping malls. *See Spayd v. Ringing Rock Lodge 665, Bhd. of R.R. Trainmen,* 270 Pa. 67, 113 A. 70 (1921) (private union could not expel member for signing petition unfavorable to union interests); *Zelenka v. Benevolent & Protective Order of Elks,* 129 N.J. Super. 379, 324 A.2d 35 (applying state constitution's speech provision to Elks Lodge policy), *cert. denied,* 66 N.J. 317 (1974); *State v. Schmid,* 84 N.J. 535, 423 A.2d 615 (1980) (applying same provision to actions of a private university), *appeal dismissed,* 455 U.S. 100 (1982);[61] *Robins v. Pruneyard Shopping Ctr.,* 23 Cal. 3d 899, 592 P.2d 341, 153 Cal. Rptr. 854 (1979) (applying state constitution to speech activity in privately owned shopping center), *aff'd,* 447 U.S. 74, 64 L. Ed. 2d 741, 100 S. Ct. 2035 (1980); *Batchelder v. Allied Stores Int'l, Inc.,* 388 Mass. 83, 445 N.E.2d 590 (1983) (no

---

[61]Regrettably, the majority's opinion forecloses any future application of our state's free speech provision to private infringements such as these. Abridgement of speech by unions, clubs, and private universities presents different factors to be considered in the balance. The majority today abandons the tools with which to adjudicate such situations.

state action required in applying petition guaranty to private shopping mall). It is worthy to note that the California and New Jersey cases bear a special relationship to Washington's constitutional jurisprudence: the constitutional provisions at issue there were similar to our own. California's speech provision, as previously mentioned, served as a model for Washington's. *Right To Speak,* at 175–77.

Many jurisdictions have declined to apply their constitutional speech guaranties to disputes involving shopping malls. Most of these courts—often basing their decisions upon constitutional language different from our own—have required some form of state action before enforcing the provision. *See SHAD Alliance v. Smith Haven Mall,* 66 N.Y.2d 496, 488 N.E.2d 1211, 498 N.Y.S.2d 99 (1985) (court looked at debates at the state constitutional convention and concluded that framers intended a state action requirement; reiterated that Bill of Rights is meant to protect individuals from State, not other private individuals); *Cologne v. Westfarms Assocs.,* 192 Conn. 48, 469 A.2d 1201 (1984) (court found "no historical basis" for a lack of a state action requirement); *Jacobs v. Major,* 139 Wis. 2d 492, 407 N.W.2d 832 (1987) (construed state action requirement through "plain language" and historical analysis); *Woodland v. Michigan Citizens Lobby,* 423 Mich. 188, 204, 378 N.W.2d 337 (1985) ("constitutionally guaranteed individual rights are drawn to restrict governmental conduct and to provide protection from governmental infringement and excesses . . ."), *reh'g denied,* 424 Mich. 1204 (1986); *Western Pa. Socialist Workers 1982 Campaign v. Connecticut Gen. Life Ins. Co.,* 512 Pa. 23, 515 A.2d 1331 (1986) (constitution concerns the functions and limitations of government, not private individuals; language of this State's provision quite different from Washington's); *see also State v. Felmet,* 302 N.C. 173, 273 S.E.2d 708 (1981) (denying speakers access to shopping mall because such speech represented an "abuse" of the right; no state action analysis).

While these courts have rejected the argument against state action, their opinions do not discuss in depth the federalist underpinnings of the doctrine and its inappropriateness at the state level. In Washington, the arguments against state action are even more persuasive than in other states: our framers witnessed the birth of the state action doctrine and specifically omitted state action language from section 5.

## IV

Although the majority decries a balancing approach and advocates a state action requirement, it essentially stops right there. It does not discuss what type of state action test it would adopt in cases such as this. Further, the majority does not tell us why there is not state action in today's case—it simply assumes so. Depending on the formulation of the requirement, there well could be. Because of these unresolved issues, we are left hanging on some of the inherent contradictions of the federal state action doctrine. State constitutional adjudication should leave behind clearer results than this.

In its attempt to overcome the state action doctrine's initial rigidity, the United States Supreme Court developed a number of exceptions to pure governmental action within the doctrine. One of these exceptions, the public function doctrine,[62] does receive some attention by the majority. See majority, at 430–33. Another line of Supreme Court precedent, however, is ignored altogether.

In *Shelley v. Kraemer,* 334 U.S. 1, 92 L. Ed. 1161, 68 S. Ct. 836, 3 A.L.R.2d 441 (1948), the Supreme Court held that judicial enforcement of racially restrictive covenants—

---

[62]Major cases developing this exception include *Smith v. Allwright,* 321 U.S. 649, 88 L. Ed. 987, 64 S. Ct. 757, 151 A.L.R. 1110 (1944) (state political party convention a public function); *Marsh v. Alabama,* 326 U.S. 501, 90 L. Ed. 265, 66 S. Ct. 276 (1946) (private company town embodied public functions); *Evans v. Newton,* 382 U.S. 296, 15 L. Ed. 2d 373, 86 S. Ct. 486 (1966) (operation of a park a public function); *Jackson v. Metropolitan Edison Co.,* 419 U.S. 345, 42 L. Ed. 2d 477, 95 S. Ct. 449 (1974) (private utility, even though monopoly, not a public function).

in themselves a purely private operation—sufficed for state action within the meaning of the Fourteenth Amendment. 334 U.S. at 20. Since *Shelley,* however, ˙the Court has refused to formulate a specific test to determine when the state's enforcement or encouragement of private activity results in state action. Instead, it has held that the determination rests on "sifting facts and weighing circumstances"—ironically putting appellate courts once again in the business of balancing. *Burton v. Wilmington Parking Auth.,* 365 U.S. 715, 722, 6 L. Ed. 2d 45, 81 S. Ct. 856 (1961). Today's majority rejects even this approach in favor of an unexplained method—one which apparently reaches the result it favors.

By the logic of *Shelley,* it is possible to find state action in today's case.[63] A court in this state has enforced the wishes of a private property owner to exclude a group seeking to exercise its state constitutional right to speak freely. That enforcement is being affirmed today. One could construe the present situation as one no longer being a strictly private dispute. As the Supreme Court stated in *Shelley*:

> The judicial action in each case [presented] bears the clear and unmistakable imprimatur of the State. . . . [J]udicial action is not immunized from the operation of the Fourteenth Amendment simply because it is taken pursuant to the state's common–law policy. . . . State action, as that phrase is understood for the purposes of the Fourteenth Amendment, refers to exertions of state power in all forms. . . .

*Shelley,* 334 U.S. at 20.

Courts and commentators who have entertained this particular state action issue have divided over its applicability. In *Sunnyside v. Lopez,* 50 Wn. App. 786, 751 P.2d 313, *review denied,* 110 Wn.2d 1034 (1988), two judges on the

---

[63]With regard to the implications of *Shelley,* Professor Erwin Chemerinsky argues:

"If any decision by a state court represents state action, then ultimately all private actions must comply with the Constitution. Anyone whose rights are violated can file suit in state court. If the court dismisses the case because the state law does not forbid the violation, there is state action sustaining the infringement of the right." Chemerinsky, *Rethinking State Action,* 80 Nw. U.L. Rev. 503, 525 (1985).

Court of Appeals, Division Three, held that police arresting a speaker on private property did not constitute state action: "To so hold precludes the private property owner from enforcing his right to exclude others and converts his property into a public forum, open to the free use of any person exercising a First Amendment right." 50 Wn. App. at 796. The court did not, however, discuss the ramifications of *Shelley*. Further, the dissent in that case came to the opposite conclusion, citing *Sutherland v. Southcenter Shopping Ctr., Inc.*, 3 Wn. App. 833, 478 P.2d 792 (1970), *review denied*, 79 Wn.2d 1005 (1971). *Sunnyside*, at 798–800 (Thompson, J., dissenting). *See also State v. Horn*, 139 Wis. 2d 473, 407 N.W.2d 854, 859–60 (1987).

Division One of the Court of Appeals reached the opposite result in *Sutherland*. The court there held that a shopping center's use of deputized security personnel to prohibit individuals from collecting petition signatures was a "necessary prelude to establishing an action for criminal trespass." *Sutherland*, 3 Wn. App. at 836. The court found this to suffice for the purposes of the state action doctrine. Professor Tribe takes a similar view, arguing that state enforcement of trespass laws to remove unwanted speakers from a "self contained area" in which people "live and work" would "violate the first and fourteenth amendments as clearly as if a government official had chosen to exclude the individual from a municipality on the same forbidden basis." L. Tribe, *American Constitutional Law* 999 (2d ed. 1988) (referring to *Marsh v. Alabama, supra*).[64]

Thus, while the applicability of state action to a case like the one at hand is apparently a matter of controversy, the majority does not shed any light on the subject. It would have us affix a state action requirement to section 5—when the plain language of that provision suggests otherwise—

---

[64]Professor Tribe argues that excluding unwanted speakers from a private home is a different matter because "the Constitution tolerates (and may even compel) placing the homeowner's right to exclude unwanted views above the speaker's desire to intrude them." (Footnotes omitted.) Tribe, at 999. For further discussion on this inherent balancing of interests, see part V, *infra*.

and then not tell us how to use it. The majority's adherence to the "conceptual disaster area"[65] of state action leaves behind a number of unanswered questions. Primarily, under the constitutional interpretive criteria adopted by this court, what aspects of the federal doctrine, if any, are appropriate? What exceptions will we adopt? How does the federal requirement—with its numerous exceptions—transpose to a state constitutional provision which is admittedly more protective than its federal counterpart? See majority, at 421. The majority does not answer these questions.

## V

This court can dispute the clarity of the historical record surrounding the drafting and passage of section 5. Ultimately, however, we must determine what is presently most appropriate for the jurisprudence of this State. The federal state action doctrine is fraught with contradictions. The Supreme Court itself has admitted that it has "never attempted the 'impossible task' of formulating an infallible test" to apply the doctrine. *Reitman v. Mulkey,* 387 U.S. 369, 378, 18 L. Ed. 2d 830, 87 S. Ct. 1627 (1967). In spite of this, today's majority would turn its back on a workable solution to the state action quandary: the *Alderwood* balancing test, used successfully in this state for 8 years.

---

[65]Black, *The Supreme Court, 1966 Term—Foreword: "State Action," Equal Protection, and California's Proposition 14,* 81 Harv. L. Rev. 69, 95 (1967). Indeed, law reviews are full of commentary and criticism of the state action doctrine (or "antidoctrine" as described by Professor Tribe). Some scholars advocate abandoning the doctrine altogether. *See generally* Chemerinsky, *supra.* Professor Chemerinsky argues that one of the original assumptions behind the state action doctrine was that the common law generally protected individual rights from private invasions. Individual rights expanded under constitutional analysis as applied to government action—largely through a normative analysis—while a more positivist common/private law lagged behind. The common law, then, did not fulfill its function of protecting private invasions of natural rights recognized by the courts under the constitution. Chemerinsky goes on to argue that under any theory of individual rights (positivist, natural law, or consensus), the state action doctrine is obsolete.

In *Alderwood Assocs. v. Washington Envtl. Coun.,* 96 Wn.2d 230, 635 P.2d 108 (1981), a plurality of this court advanced a 3–point test for resolving private disputes between speech and property rights under the state constitution. The first point of inquiry considers the use and nature of the private property. This court stated:

> As property becomes the functional equivalent of a downtown area or other public forum, reasonable speech activities become less of an intrusion on the owner's autonomy interests. When property is open to the public, the owner has a reduced expectation of privacy and, as a corollary, any speech activity is less threatening to the property's value.

(Citations omitted.) *Alderwood,* 96 Wn.2d at 244. The second factor in the test concerns the nature of the speech activity. Because speech is a preferred activity, it is given a greater weight in the balance. *Alderwood,* at 244. The last factor deals with reasonable possibilities for regulating the speech involved. As we stated:

> No one has an absolute right to free speech. The time, manner, and place of the exercise of that right may be regulated.
> Some speech activity may be so unreasonable as to violate the property owner's First Amendment and property rights. . . . In such a situation, the speech will not be protected.

(Footnote and citations omitted.) *Alderwood,* at 245.

Trial courts in Washington, including the court below, have been applying the *Alderwood* test to speech disputes since we announced that decision in 1981. The result has not been a revolution, greatly expanding the right to speech. Rather, the *Alderwood* test has provided a clear and coherent limiting principle to the right declared in section 5.

The recent Court of Appeals opinion in *Sunnyside v. Lopez, supra,* provides an example of the *Alderwood* test in use. In that case, owners of a clinic offering abortions sought to prohibit antiabortion leafleters from its grounds. The court focused primarily on the first of the *Alderwood* factors. It concluded that the size and nature of the property involved tipped the weight of the interests in

favor of the medical clinic's owners.[66] *Sunnyside,* at 794–95.

The trial judge below also considered the balance set forth by *Alderwood.* He stated: "When the interests of the parties are balanced in view of the plaintiffs' conceded right to regulate the time, place, and manner of speech upon its premises, the balance tips in favor of plaintiffs." Clerk's Papers, at 196.

The factors in the *Alderwood* test, although specifically developed in light of the language of section 5, are based in part on the United States Supreme Court's own precedent involving competing constitutional interests. *See Pruneyard Shopping Ctr. v. Robins, supra; Cox v. Louisiana,* 379 U.S. 536, 554–55, 13 L. Ed. 2d 471, 85 S. Ct. 453 (1965); *Marsh v. Alabama,* 326 U.S. 501, 90 L. Ed. 265, 66 S. Ct. 276 (1946). Much of the Supreme Court's balancing approach has involved the "state action" inquiry.[67] Thus, the contexts in which the balancing of interests occurred differ in kind from today's case. Nonetheless, the core inquiry is distinctly similar. In the end, however, *Alderwood* escapes the inherent contradictions which have entered into Supreme Court doctrine in this area over time.

In *Marsh,* the Court considered the nature of the Gulf Corporation's property rights over its company town of Chickasaw. The Court stated: "Ownership does not always mean absolute dominion. The more an owner, for his advantage, opens up his property for use by the public in general, the more do his rights become circumscribed by the statutory and constitutional rights of those who use it."

[66]The dissent argued that state action was present, therefore the stricter dictates of section 5's protections against state interference came into play. *Sunnyside,* at 799 (Thompson, J., dissenting).

[67]The Supreme Court's doctrine developing the limits of time, place, and manner speech regulation also provided a basis for the *Alderwood* test. In *Cox v. Louisiana, supra,* the Court balanced a municipality's right to regulate the use of city streets against the petitioners' rights of speech. The Court found that speech rights, to some degree, had to accommodate these interests. *Cox,* 379 U.S. at 554–55.

*Marsh,* 326 U.S. at 506. The Court continued: "When we balance the Constitutional rights of owners of property against those of the people to enjoy freedom of press and religion, as we must here, we remain mindful of the fact that the latter occupy a preferred position." *Marsh,* at 509. After balancing these interests, the Court concluded that the state's imposition of criminal sanctions for exercising speech activity on the private property could not stand. *Marsh,* at 509.

The private nature of the property involved in the balance received attention in *Rowan v. United States Post Office Dep't,* 397 U.S. 728, 25 L. Ed. 2d 736, 90 S. Ct. 1484 (1970). There, the Court considered the right of a homeowner, under the authority of federal statute, to exclude unwanted mailings from his home in light of the First Amendment. The unanimous Court stated: "Weighing the highly important right to communicate . . . against the very basic right to be free from sights, sounds, and tangible matter we do not want, it seems to us that a mailer's right to communicate must stop at the mailbox of an unreceptive addressee." *Rowan,* 397 U.S. at 736–37.

The Court used a similar balancing approach in *Amalgamated Food Employees Union Local 590 v. Logan Vly. Plaza, Inc.,* 391 U.S. 308, 316–19, 20 L. Ed. 2d 603, 88 S. Ct. 1601 (1968) (considering the characteristics of the property), and *Lloyd Corp. v. Tanner,* 407 U.S. 551, 564, 33 L. Ed. 2d 131, 92 S. Ct. 2219 (1972) (considering the relationship of the speech activity to the property), cases directly considering the ability to exercise one's First Amendment rights in a privately owned shopping mall. For purposes of reconciling federal rights in shopping mall speech disputes, however, the Supreme Court abandoned the balancing approach in *Hudgens v. NLRB,* 424 U.S. 507, 47 L. Ed. 2d 196, 96 S. Ct. 1029 (1976).

Nonetheless, *Hudgens* did not completely remove the balancing approach from the picture. The Court simply changed the focus of the balance: instead of balancing the constitutional right to speech itself, it concentrated on that

right as expressed in statute. That the right was cast in statutory terms did not change the nature of the activity behind it. The Court remanded to the NLRB to scrutinize the relationship between property rights and the right to picket under section 7 of the National Labor Relations Act. *Hudgens,* 424 U.S. at 521–23. The NLRB eventually compelled the shopping center to allow picketing. *See Hudgens v. Local 315, Retail, Wholesale & Dep't Store Union,* 230 N.L.R.B. 414, 95 L.R.R.M. (BNA) 1351 (1977); *see also* L. Tribe, at 1001.

The Court followed a similar approach in *Pruneyard Shopping Ctr. v. Robins,* 447 U.S. 74, 64 L. Ed. 2d 741, 100 S. Ct. 2035 (1980). There, the speech right was secured under the state constitution rather than by federal statute. Under an analysis determining whether the government enforcement of speech rights amounted to a taking of the private property, the Court considered "such factors as the character of the governmental action [in that case, enforcement of speech rights], its economic impact, and its interference with reasonable investment–backed expectations." *Pruneyard,* 447 U.S. at 83. The Court engaged in an even more explicit balancing test when it considered whether the shopping center's own First Amendment rights—the right to prevent the expression of contrary opinions on one's property—were violated by California's enforcement of its state constitution. *Pruneyard,* at 87.

These latter two cases show that when a government takes "action"—either through federal statute or state constitution—to enforce speech rights, the Supreme Court will continue to analyze the underlying conflicts with a balancing approach, considering many of the factors utilized in the *Alderwood* test. Distinguishing these cases from the present one, however, is not as simple as it might seem. In terms of defining state action, the distinction between the state enforcing speech rights through the state constitution and enforcing property rights through trespass laws is, to say the least, not clear. The Supreme Court has not made clear why balancing should be abandoned in the latter case

but not the former. Such an approach favors property over speech rights and contravenes the declaration in *Marsh v. Alabama, supra,* that the latter "occupy a preferred position" in relation to the former. *Marsh,* at 506.[68]

This court, however, need not adopt such contradictions. Federalism allows the states to operate as laboratories for more workable solutions to legal and constitutional problems. *See Alderwood,* at 238. As part of our obligation to interpret our State's constitution, we have the opportunity to develop a jurisprudence more appropriate to our own constitutional language. By adhering to *Alderwood,* we essentially would engage in analysis similar to what the Supreme Court has done in the past and continues to do in selected cases. The only difference is that *Alderwood* presents a more complete and evenly applied inquiry into the actual rights in conflict.[69]

Using the criteria set forth in *Alderwood,* I would find the NDPC speech rights did not extend to allowing it to solicit memberships and contributions on shopping mall property. The nature of this speech activity competed

---

[68]One theoretical explanation of the Supreme Court's view draws upon Professor Chemerinsky's idea that the common law has lagged behind public constitutional law in safeguarding rights in the private sphere. *See generally* Chemerinsky, *supra* at 507 n.16. The Court apparently recognizes common law property rights—albeit enforced by state and local trespass laws—as having precedence over rights to speech when these latter rights are not supported by statutory or state constitutional enforcement. Because the Court identifies state action in the latter enforcement scenario but not the former, it perpetuates, through the state action doctrine, the ability to safeguard against private actors only those rights long protected by common law. Rights such as speech which, in modern society, hold a "preferred position" but have evolved to maturity after the development of the common law have less capacity for enforcement as a result.

[69]Further, *Alderwood* identified two policy considerations in the United States Supreme Court's state action balance approach that are foreign to a state–based inquiry. First, the Supreme Court must establish a rule for the entire country; thus, national considerations are inherent in any decision. Second, federalism prevents the Court from adopting a rule which restricts the states from fulfilling their role as experimenters. *Alderwood,* at 242. Consequently, a state–based jurisprudence, being freed from these constraints, can craft a doctrine more appropriate to a state's culture, locale, and constitutional language.

directly with the property interests of the mall owners and tenants—who were in the retail business. In contrast to the speech activity at issue in *Alderwood*—that of soliciting signatures for an initiative petition—the NDPC's actions are more incompatible with the uses of the mall itself. For these reasons, and for those I have developed above, I concur with the majority in result only.

PEARSON, J. (concurring in the result)—In a case analogous to the case at bench, a majority of this court recently held, "[t]he issuance of the permanent injunction by the trial court constitutes State action." *Bering v. Share,* 106 Wn.2d 212, 221, 721 P.2d 918 (1986). I am persuaded that should be the law of this case as well. Nevertheless, the majority today not only fails to apply the holding in *Bering v. Share, supra,* but altogether fails even to acknowledge its existence.

I would hold the granting of the permanent injunction constituted state action sufficient to invoke the protections afforded by Const. art. 1, § 5. Accordingly, the balancing of *Alderwood Assocs. v. Washington Envtl. Coun.,* 96 Wn.2d 230, 635 P.2d 108 (1981) criteria engaged in by the concurrence properly resolves the issue at hand. Thus, I concur in the result.

DORE, J., concurs with PEARSON, J.